560 F.2d 539
 UNITED STATES of America, Appellee,
v.
AMREP CORPORATION, Rio Rancho Estates, Inc., ATC Realty
Corporation, Howard W. Friedman, Chester Carity,
Henry L. Hoffman, Daniel Friedman,
Defendants-Appellants.
 Nos. 1331-1337, Dockets 77-1150 to 77-1156.
 United States Court of Appeals,
Second Circuit.
 Argued June 22, 1977.
Decided Aug. 8, 1977.
 
 Stanley S. Arkin, Mark S. Arisohn, Lee Cross, Paul, Weiss, Rifkind, Wharton & Garrison, Arthur L. Liman, Robert S. Smith, New York City, Robert Abrahams, New York City, of counsel, for defendants-appellants Amrep Corp., Rio Rancho Estates, Inc., ATC Realty Corp., Howard W. Friedman and Henry L. Hoffman.
 Peter E. Fleming, Jr., New York City (Curtis, Mallet-Prevost, Colt & Mosle, John E. Sprizzo, Eliot Lauer, New York City, of counsel), for defendants-appellants Chester Carity and Daniel Friedman.
 Patricia M. Hynes, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, Alan R. Kaufman, Michael S. Devorkin, Audrey Strauss, Robert J. Jossen, Asst. U. S. Attys., John F. Kaley, Special Asst. U. S. Atty., New York City, of counsel), for appellee.
 Before MULLIGAN, GURFEIN and VAN GRAAFEILAND, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 These are appeals from judgments convicting defendants on 20 counts of mail fraud, 18 U.S.C. § 1341, and on 5 counts of interstate land sale fraud, 15 U.S.C. § 1703(a), following a jury trial in the United States District Court for the Southern District of New York. We affirm.
 
 
 2
 All of the counts were based upon sales from a 91,000 acre tract of land known as the Rio Rancho Estates, located in Sandoval County, New Mexico, some 15 to 20 miles northwest of downtown Albuquerque. The land is mainly rolling hills with sparse growths of sagebrush and native grasses in sandy soil. Title was acquired by Rio Rancho Estates, Inc., a wholly owned subsidiary of AMREP[1] in several installments, 54,000 acres in 1961 and the balance between 1969 and 1971.
 
 
 3
 Rio Rancho had the property staked out into 86,000 lots; and, by 1976, over 77,000 of them had been sold, mostly to people living outside of New Mexico. However, as of 1976, only 1,700 lots on this 142 square mile tract were occupied by homes. Moreover, most of the vacant lots were on unpaved roads and without utilities of any sort. Nevertheless, although the entire tract had been purchased for $17,800,000, the 77,000 lots were sold for a total of approximately $170,000,000.
 
 
 4
 It was the government's contention that the volume of sales and the disparity between the purchase price and selling price resulted in large measure from two fraudulent sales representations made by appellants. The first of these was that Albuquerque was "bursting at the seams" with people and was so situated geographically that it could grow only to the northwest through Rio Rancho. The second was that the purchase of a Rio Rancho lot would be a safe and profitable investment. The issues created by these two contentions were submitted to the jury, which convicted appellants on all counts. The evidence introduced during the ten-week trial, viewed in the light most favorable to the government, United States v. Goldberg, 527 F.2d 165, 168 (2d Cir. 1975), cert. denied, Poncono Int. Corp. v. United States, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), supported the jury's verdict.[2]
 
 
 5
 Most of the sales after 1964 resulted from slickly organized and carefully scripted promotional dinners and tours. The scripts, which all sales representatives were required to follow, emphasized that Albuquerque, "one of the fastest growing cities" in the country, had "one unique, serious problem." It was surrounded on three sides by mountains or government land so that its future growth could go in one direction only, i. e., "in the very path where Rio Rancho Estates is located." Rio Rancho, one of the sales pitches said, was "where the City must grow to, grow into, grow out of."
 
 
 6
 The government introduced substantial evidence, which the jury could believe, that these representations were untrue and known by the defendants to be untrue. For example, a planning report published by Albuquerque in 1964 stated:
 
 
 7
 Albuquerque has an abundance of vacant land available for urban development. Even the most optimistic growth projections would not utilize this land within the current century.
 
 
 8
 Moreover, a private consulting firm which did a market survey for defendants in 1965 arrived at the same conclusion. Its report stated:
 
 
 9
 Despite the expected doubling of Albuquerque's population over the next 20 years to over 600,000 residents, ample undeveloped suburban land exists more proximate to the City and its desirable parts than Rio Rancho's land, such that only a small and selective local market penetration by Rio Rancho is likely over the 20 year period from 1966 to 1985.
 
 
 10
 Witnesses produced by the government testified that the greatest growth during the 15 years in which the Rio Rancho property was being promoted and sold was in the northeast section of Albuquerque and that there was still land in that area available for residential development. In short, the government's proof was sufficient to establish that Albuquerque was not required to expand to Rio Rancho and it had not done so.
 
 
 11
 Declarations of opinion as to future events which the declarant does not in fact hold may be found by a jury to be fraudulent. United States v. Grayson, 166 F.2d 863, 866 (2d Cir. 1948). Declarations made with reckless indifference for the truth may be viewed in the same light. United States v. Love, 535 F.2d 1152, 1158 (9th Cir.), cert. denied, 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976). Indeed, as Judge Learned Hand stated in Knickerbocker Merchandising Co. v. United States, 13 F.2d 544, 546 (2d Cir.), cert. denied, 273 U.S. 729, 47 S.Ct. 239, 71 L.Ed. 862 (1926), "(s)ome utterances are in such form as to imply knowledge at first hand, and the utterer may be liable, even though he believes them, if he has no knowledge on the subject." Whether appellants' representations concerning Albuquerque's northwest expansion were made in good faith was a question for the jury.
 
 
 12
 Because of Albuquerque's failure to expand to Rio Rancho and also because of the manner in which Rio Rancho itself was developed,[3] there was an extremely limited resale market for Rio Rancho lots. The jury could conclude from this that the purchase of these lots as a profitable investment was unwise and unwarranted. The jury could also find that the purchasers whom the government produced as witnesses were induced to buy by defendants' representations that they would be making a sound and profitable investment. The purchasers were told that "investment" was "truly the key, the theme" to defendants' program, that it was a "land investment program" in which they could make a great deal of money, up to 25% a year on their investment. Indeed, using as illustrations sales from dissimilar property in Albuquerque itself and applying principles of financial leverage thereto, defendants' representatives showed how the purchasers could realize annual gains of 150% or more on the amount which they invested.
 
 
 13
 It was for the jury to weigh these programmed remarks against a reservation contained in the printed offering statement that "resale for a profit might be difficult for a number of years," in determining whether there existed a scheme or artifice to defraud. United States v. Press, 336 F.2d 1003, 1010 (2d Cir. 1964), cert. denied, 379 U.S. 965, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965); Perry v. United States, 136 F.2d 109, 111 (10th Cir.), cert. denied, 320 U.S. 743, 64 S.Ct. 44, 88 L.Ed. 441 (1943). Opinions given with respect to anticipated profits carry with them the representation that they are honestly held. Irwin v. United States, 338 F.2d 770, 773-74 (9th Cir. 1964), cert. denied, 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433 (1965); Deaver v. United States, 81 U.S.App.D.C. 148, 155 F.2d 740, 743, cert. denied, 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659 (1946); Blue v. United States, 138 F.2d 351, 357 (6th Cir. 1943), cert. denied, 322 U.S. 736, 64 S.Ct. 1046, 88 L.Ed. 1570 (1944). The expression of an opinion not honestly entertained is a factual misrepresentation. United States v. Rubinstein, 166 F.2d 249, 255 (2d Cir.), cert. denied, 333 U.S. 868, 68 S.Ct. 791, 92 L.Ed. 1146 (1948).
 
 
 14
 The bona fides which appellants assert is demonstrated by their program permitting cash refunds and the exchange of unimproved for improved property was also for the triers of fact. Lustiger v. United States, 386 F.2d 132, 138 (9th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142 (1968). In weighing appellants' asserted good intentions, the jury could consider that a personal visit to Rio Rancho was required before a refund could be requested and that only a limited amount of improved property was available for exchange.
 
 
 15
 The efforts of the individual defendants to disassociate themselves from the acts of the corporation and its agents were rejected by the jury, and the jury was justified in so doing. We note that the corporate defendants and the individual defendants Howard W. Friedman and Henry L. Hoffman were represented originally by the same firm of attorneys. When the question of a possible conflict was raised by the government, counsel assured the court that there was no conflict between the corporation and the individuals.[4] The evidence subsequently offered by the government did, in fact, show that the individual defendants were fully aware of the corporate activities found to be fraudulent and participated actively therein.
 
 
 16
 In his opening remarks to the jury, counsel for defendants Howard W. Friedman and Henry L. Hoffman forecast the proof which would follow by referring to the "representations which (his clients) permitted to be made by the company in its literature and by their salesmen" and told the jury that the issue was "were my clients justified in permitting that to be said." Substantial evidence was introduced to establish that all of the defendants were cognizant of the type of representations being made and both permitted and encouraged them.
 
 
 17
 The admissibility of evidence in a mail fraud scheme involving two or more persons is determined similarly to that in a conspiracy. "The acts and declarations of each party to the scheme made in furtherance or execution thereof are admissible against all." United States v. Grow, 394 F.2d 182, 203 (4th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968); United States v. Cohen, 516 F.2d 1358, 1364 (8th Cir. 1975); United States v. Cohen, 145 F.2d 82, 90 (2d Cir. 1944), cert. denied, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945). So long as a transaction is within the general scope of a scheme on which all defendants had embarked, a defendant not directly connected with a particular fraudulent act is nonetheless responsible therefor if it was of the kind as to which all parties had agreed. United States v. Epstein, 154 F.2d 806, 809 (2d Cir.), cert. denied, 328 U.S. 858, 66 S.Ct. 1350, 90 L.Ed. 1629 (1946); United States v. Cohen, supra, 145 F.2d at 90.
 
 
 18
 Of course, participation by a corporation in a scheme to defraud does not ipso facto make participants of its officers. Prerequisite to such a finding is proof that the officers were "conscious promoters" of the illicit scheme. United States v. Dilliard, 101 F.2d 829, 834 (2d Cir. 1938), cert. denied, 306 U.S. 635, 59 S.Ct. 484, 83 L.Ed. 1036 (1939). Where, however, the prosecution introduces evidence of active and knowing participation by corporate officers, they are equally liable with the corporation. United States v. Kyle, 257 F.2d 559, 562-63 (2d Cir. 1958), cert. denied, 358 U.S. 927, 79 S.Ct. 312, 3 L.Ed.2d 301 (1959); Nye & Nissen v. United States, 168 F.2d 846, 852-53 (9th Cir. 1948), aff'd, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949). And, where, as here, the proof shows that corporate officers participated in setting up a fraudulent sales program, trained and instructed the salesmen, prepared sales pitches widely and consistently used, and monitored the results thereof, the statements and representations made by the sales representatives in furtherance of the scheme are admissible against the officers. Beck v. United States, 305 F.2d 595, 600-602 (10th Cir.), cert. denied, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123 (1962); Reistroffer v. United States, 258 F.2d 379, 386-88 (8th Cir. 1958), cert. denied, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959); United States v. Tellier, 255 F.2d 441, 450 (2d Cir.), cert. denied, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958); United States v. Press, supra, 336 F.2d at 1009; United States v. Dilliard, supra, 101 F.2d at 836. This is so, even though the salesmen themselves are not participants in the fraudulent scheme. Pritchard v. United States, 386 F.2d 760, 766 (8th Cir. 1967), cert. denied, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968); Schaefer v. United States, 265 F.2d 750, 754 (8th Cir.), cert. denied,361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (1959).
 
 
 19
 Even if the representations of the unindicted salesmen, standing alone, were not conclusive, they were admissible; and, together with the writings, literature and lulling letters sent under the defendants' directions, they were sufficient to make a question of fact as to the defendants' bad faith and fraudulent intent. Harris v. United States, 261 F.2d 792, 795 (9th Cir. 1958), cert. denied, 360 U.S. 933, 79 S.Ct. 1446, 3 L.Ed.2d 1546 (1959). Evidence of customers' complaints called to defendants' attention was also relevant on the issue of their bad faith and fraudulent intent. United States v. Press, supra, 336 F.2d at 1011. It is often difficult to prove fraudulent intent by direct evidence, and it must be inferred from a pattern of conduct or a series of acts "rather aptly designated as badges of fraud." Aiken v. United States, 108 F.2d 182, 183 (4th Cir. 1939); United States v. Simon, 425 F.2d 796, 809 (2d Cir. 1969), cert. denied, 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970); Bentel v. United States, 13 F.2d 327, 329 (2d Cir.), cert. denied, 273 U.S. 713, 47 S.Ct. 109, 71 L.Ed. 854 (1926). There was evidence that each of the individual defendants knew or could have known by the exercise of reasonable diligence that the statements made to prospective purchasers were false, and the issue of his bad faith was therefore for the jury. Stone v. United States, 113 F.2d 70, 75 (6th Cir. 1940); United States v. Henderson, 446 F.2d 960, 966 (8th Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); cf. United States v. Benjamin, 328 F.2d 854, 862 (2d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964). Self-delusion, even if existent, does not justify baseless representations. Hawley v. United States, 133 F.2d 966, 970 (10th Cir. 1943).
 
 
 20
 Evidence that defendants had made the filings required by Art. 9-A of the New York Real Property Law § 337 et seq., did not establish that defendants' conduct had been approved as legal in that State. Section 337-b(5) specifically so provides. Indeed, if defendants were engaged in a fraudulent course of conduct, whether or not that conduct was approved by a state administrative agency may be immaterial on the issue of legality. United States v. Sylvanus, 192 F.2d 96, 106 (7th Cir. 1951), cert. denied, 342 U.S. 943, 72 S.Ct. 555, 96 L.Ed. 701 (1952). Proof that defendants had complied with the state regulations might be relevant on the issue of defendants' good faith, United States v. Diamond, 430 F.2d 688, 694 (5th Cir. 1970), and the district judge permitted the jury to consider it in this light.
 
 
 21
 Appellants' able and resourceful counsel make numerous assertions of error in the trial court's rulings and charge which merit little additional discussion.
 
 
 22
 Appellants contend that, in proving a scheme to defraud by means of several misrepresentations, every misrepresentation charged in the indictment must be proved and the failure to prove one must result in a retrial. "(Appellants) confuse the scheme to defraud, which is the gist of the offense, with the means adopted to effectuate that scheme." Simons v. United States, 119 F.2d 539, 549 (9th Cir.), cert. denied, 314 U.S. 616, 62 S.Ct. 78, 86 L.Ed. 496 (1941); Holmes v. United States, 134 F.2d 125, 133 (8th Cir.), cert. denied, 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722 (1943). A scheme to defraud may consist of numerous elements, no particular one of which need be proved if there is sufficient overall proof that the scheme exists. United States v. Joyce, 499 F.2d 9, 22 (7th Cir.), cert. denied, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974); United States v. Reicin, 497 F.2d 563, 568 (7th Cir.), cert. denied, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); Lustiger v. United States, supra, 386 F.2d at 135-36; Anderson v. United States, 369 F.2d 11, 15 (8th Cir. 1966), cert. denied, 386 U.S. 976, 87 S.Ct. 1171, 18 L.Ed.2d 136 (1967); Schaefer v. United States, supra, 265 F.2d at 753-54; cf. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 250, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Appellants' reliance on United States v. Natelli, 527 F.2d 311 (2d Cir. 1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976) is misplaced. In that case, the defendant was charged in a single count with violating the securities law by making false statements in a proxy statement. Because the crime charged consisted of the making of such statements, the erroneous failure of the trial court to direct a verdict as to one of the alleged falsities, arising out of a separate state of facts, made the jury's general verdict ambiguous and required a new trial. Here, the crime charged was the scheme to defraud, and the alleged false statements were merely means for carrying it into effect.
 
 
 23
 The government having established that tape recordings of a sales dinner and a sales meeting were what it claimed them to be, see United States v. Natale, 526 F.2d 1160, 1173 (2d Cir. 1975), cert. denied, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976), sufficient foundation was laid for their admission without proof as to the chain of possession. See United States v. Steinberg, 551 F.2d 510, 515 (2d Cir. 1977). In view of the overwhelming testimony concerning the lack of a resale market,[5] the admission of the realtors' letters referring to this matter was at most harmless error. Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 537 (5th Cir. 1974). Other letters received by AMREP were properly admitted, not for the truth of their contents, but on the question of notice. See United States v. Press, supra, 336 F.2d at 1011-12. The district judge charged correctly that appellants' belief in the ultimate success of Rio Rancho would not excuse their fraudulent actions. United States v. Diamond, supra, 430 F.2d at 691; United States v. Tellier, supra, 255 F.2d at 449. There was adequate proof of mailing to support all of the mail fraud counts. See United States v. Toliver, 541 F.2d 958, 966-67 (2d Cir. 1976); United States v. Marando, 504 F.2d 126, 128-30 (2d Cir.), cert. denied, 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974). There was no error in the admission of the defendant Friend's grand jury testimony, carefully redacted to exclude all references to the other defendants, United States v. Amrep Corp., 545 F.2d 797, 800 (2d Cir. 1976); and appellants' Fifth Amendment contentions involving the giving of this testimony are without merit. Lawn v. United States, 355 U.S. 339, 349, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); United States v. Colasurdo,453 F.2d 585, 596 (2d Cir. 1971), cert. denied, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). The grand jury could properly return a redacted superseding indictment without recalling the witnesses who had already testified before it. United States v. Cooper, 464 F.2d 648, 654 (10th Cir. 1972), cert. denied, 409 U.S. 1107, 93 S.Ct. 901, 34 L.Ed.2d 688 (1973).
 
 
 24
 Our review of the record satisfies us that the district judge allowed the defendants the greatest of leeway in challenging the government's case. His rulings were made in a manner which vigorously and consistently protected appellants' rights, and he gave defense counsel extremely wide latitude in their cross-examination of the government's witnesses. Appellants received a fair trial. The factual determination of their guilt was for the jury. United States v. Sears, 544 F.2d 585, 586 (2d Cir. 1976); United States v. Baren, 305 F.2d 527, 533 (2d Cir. 1962).
 
 
 25
 Judgments of conviction are affirmed.
 
 
 
 [1]
 Appellant ATC Realty Corporation was also a wholly owned subsidiary of AMREP and handled sales in the New York area. Appellant Howard W. Friedman was president of both AMREP and Rio Rancho Estates and a director of ATC. Chester Carity was executive vice president of AMREP and Rio Rancho Estates and president of ATC. Henry Hoffman was senior vice president of AMREP and Rio Rancho Estates until 1974 and thereafter a director. He also served as an officer and director of ATC. Daniel Friedman was senior vice president of sales and a director of AMREP and a vice president of Rio Rancho
 
 
 [2]
 References made herein to the more than 7,000 pages of trial testimony are, of necessity, summary in nature
 
 
 [3]
 Defendants themselves played a substantial role in destroying the resale market, when they purchased 37,000 additional acres of land and put them on the market
 
 
 [4]
 Separate counsel were substituted for the corporate defendants shortly before selection of the jury began
 
 
 [5]
 The government established by direct testimony that there were 690 multiple listings of Rio Rancho property between 1971 and 1973 and only 20 sales. AMREP's filing with the SEC also attested to the fact that there was no resale market, as did the letters which it sent to inquiring property owners