**In re Edward S. COHEN, Debtor.**

**Hilda DE LA CRUZ, Nelfo C. Jimenez, Maria Morales, Gloria Sandoval, Hector Santiago, Santia Santos, Elba Saravia, Elvia Siguenzia, Enilda Tirado, Plaintiffs,**

v.

**Edward S. COHEN, Defendant.**

**Bankruptcy No. 90–25340.
Adv. No. 91–2094.**

United States Bankruptcy Court,
D. New Jersey.

Oct. 24, 1994.

Hudson County Legal Services Corp. by Gregory G. Diebold, Jersey City, NJ, for plaintiffs.

Monaghan, Rem & Zeller, P.C., by Robert Zeller, Hackensack, NJ, for debtor-defendant.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

On November 12, 1993, the Court conducted a trial in the matter of *Hilda De La Cruz et al. v. Edward S. Cohen*, Adv. No. 91–2094. The following constitutes the Court's findings of fact and conclusions of law.

## FACTS

From October, 1984 until the end of 1990, the debtor, Edward S. Cohen ("Debtor" or "Defendant" or "Cohen") and his father, Nathan Cohen, managed and operated real estate housing. The first building they purchased was a multiple dwelling located at 502 Jefferson Street in Hoboken, New Jersey (the "Jefferson Property"). *See* Transcript of November 12, 1993 trial (hereinafter "Trans.") p. 47.

At the time Cohen and his father purchased the Jefferson Property, Cohen had no formal education or training regarding the management and ownership of real estate, although he did graduate from high school.[1] Trans. p. 47 and 44. Essentially, any training Cohen obtained came from the actual experience of owning real estate. Trans. p. 48.

In August 1985, Cohen and his father purchased another multiple dwelling property known as 600 Monroe Street, Hoboken, New Jersey (the "Monroe Property"), which they owned until December 1989. Trans. p. 44. In addition to the two Hoboken properties, the Cohens subsequently purchased the following properties: 717 Palisades Avenue, Union City; 34–40 Plum Street, Paterson, NJ; 210 South Street, Jersey City, NJ; 1026 South Orange Avenue, Newark, New Jersey; 14 Beach Street, Paterson, NJ.[2] Trans. p.

---

1. Cohen testified that in May 1992 he obtained a bachelor's degree in history. Trans. p. 45.

2. The Transcript of the proceedings is unclear about which town the Beach Street property was

48–50, 64. All of these properties were rental properties occupied at one time or another by tenants. Trans. p. 49.[3]

It was the Debtor's inability to generate sufficient income to cover the expenses of ownership of all of this property that eventually caused the Debtor to seek relief from the bankruptcy court.[4] Trans. p. 50. On November 21, 1990, the Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code. Charles M. Forman was appointed Chapter 7 Trustee by the United States Trustee. The Debtor indicated that the liquidation of all of the properties he owned at the time of filing went to pay his creditors and he was left with nothing. Trans. p. 50.

Prior to his bankruptcy, however, the Debtor operated the Monroe property, which had 18 apartment units, as a rental property. A superintendent named "Sandy" managed the property and rented out the apartments. Trans. p. 18.

During the period that the Debtor rented the Monroe property, August 1985 through December 1989, a Rent Control ordinance governed the establishment and increase of any rents in Hoboken. *See* Hoboken Code § 155 et seq. (Plaintiffs' Exhibit P–1A). Beginning in September 1989, Cohen received notice from the Rent Leveling and Stabilization Board (the "Board") informing him that he was charging certain of his tenants rent in excess of the legal rent for the apartment. *See* Plaintiffs' Exhs. P–2 through P–7 and P–9 through P–10 (includes copies of Hoboken Rent Leveling Administrators decisions). The Board provided that Cohen overcharged the following tenants: Hilda De La Cruz, Nelfo C. Jimenez, Maria Morales, Gloria Sandoval[5], Hector Santiago, Santia Santos,

Elba Saravia, Elvia Sequenzia, and Enilda Tirado (hereinafter this group of tenants shall be referred to as "Tenants" or "Plaintiffs").

Hilda De La Cruz began renting an apartment at the Monroe Property in March 1988 at a rate of $500 per month.[6] Trans. p. 16. The Board indicated the legal amount of rent for the apartment was $175 monthly. *See* Exhibit P–2. She further indicated that she was not aware of a rent control ordinance at the time she rented the apartment. Trans. p. 16. Ms. De La Cruz is originally from Santo Domingo and completed school to a grade level of six. Trans. p. 17.

Elvia Sequenzia moved into an apartment at 600 Monroe Street in April 1988 and paid rent at the monthly rate of $450.[7] Trans. p. 18–19. The Board provided that the legal rate of rent was $221 monthly. *See* Exhibit P–9. At the time she moved in, Ms. Sequenzia was not aware that the rent she was paying exceeded the legal limit. Trans. p. 19. Ms. Sequenzia was born in Ecuador and attended school until grade level six. Trans. p. 19–20.

Nelfo Jimenez and his wife moved into an apartment at 600 Monroe Street on December 31, 1987. Trans. p. 21. Jimenez paid rent in the amount of $500 monthly and had no knowledge at the time he moved in that the legal rate of rent was much less. Trans. p. 21. In fact, the Board determined that the legal rate of rent was $221 monthly. *See* Exhibit P–3. Jimenez emigrated from Santo Domingo and completed school up to grade level six. Trans. p. 22.

located, but it is mentioned together with the other Paterson properties. *See* Trans. p. 64.

3. The Cohens also owned two vacant lots in Spring Valley and Klogsberg New York. Trans. p. 50.

4. The Debtor's father, Nathan Cohen, also filed for relief under the Bankruptcy Code at or about the same time.

5. The plaintiff named herein is Gloria Sandoval, the sister of Raphael Sandoval. It appears that Raphael Sandoval negotiated and rented the apartment for the both of them. Trans. p. 33–34.

6. Although Plaintiff's Proposed Findings of Fact and Conclusions of Law filed August 12, 1991 (hereinafter "Plaintiff's Proposed Findings") indicates April 1987 as the inception date for Hilda De La Cruz, at trial, she testified that she began living at 600 Monroe Street in March 1988. *Compare* Trans. p. 16 *with* Plaintiff's Proposed Findings ¶ 4.

7. Although Plaintiff's Proposed Findings indicates June 1988 as the inception date for Elvia Sequenzia, at trial, she testified that she began living at 600 Monroe Street in April 1988.

In January 1989, Cohen reduced the monthly rent for Mr. Jimenez to $275. Trans. p. 23 Cohen testified that he reduced the rent in return for Mr. Jimenez rendering services as co-superintendent. Trans. p. 58. Mr. Jimenez asserted at trial that Cohen reduced the rent since the Debtor knew that Jimenez went to the rent control Board. Trans. p. 23.

Maria Morales began renting an apartment at the Monroe Property in May 1987 for a monthly rent of $450.[8] Trans. p. 25. The Board provided that the legal rate of rent for the apartment Ms. Morales rented was $190 monthly. *See* Exhibit P–4. Ms. Morales testified that she was born in Santo Domingo and completed high school. Trans. p. 25. She further testified that she was not aware that the apartment was subject to rent control at the time she rented it. Trans. p. 25.

Hector Santiago moved into 600 Monroe Street in September 1987 and was not aware of any rent control ordinance.[9] Trans. p. 26. The Board determined that the legal rate of rent for Mr. Santiago's apartment was $162 monthly, even though he paid $400 a month to Cohen. *See* Exhibit P–6 and Plaintiff's Proposed Findings ¶ 4. Mr. Santiago emigrated from Santo Domingo and completed school up to the level of grade six. Trans. p. 26.

Enilda Tirado began living at 600 Monroe Street in July 1982.[10] Trans. p. 27. Prior to Cohen's purchase of the property, Ms. Tirado paid monthly rent at a rate of $215. Trans. p. 27. She continued paying $215 a month even after Cohen purchased the property, although the legal rate of rent was only $175 monthly. Trans. p. 28 and Exhibit P–10. Ms. Tirado testified that she did not know anything about rent control when Cohen took over the property. Trans. p. 28. Ms. Tirado was born in Columbia and completed high school. Trans. p. 28.

Santia Santos testified that she moved into 600 Monroe Street in October 1984, although she was not exactly sure of the date.[11] Trans. p. 29. She further testified that at the time she moved into the apartment she did not know anything about rent control. Trans. p. 29. Ms. Santos paid monthly rent of $250 the entire time she rented an apartment at 600 Monroe Street notwithstanding that the legal rate of rent was only $156 monthly. *See* Plaintiff's Proposed Findings ¶ 4 and Exhibit p–7. Originally born in Puerto Rico, Ms. Santos competed school to grade level six. Trans. p. 30.

The final plaintiff, Gloria Sandoval, was not present at trial. Her brother, Raphael Sandoval, did testify and he claims that he is the one who dealt with the superintendent to rent the apartment for himself and his sister.[12] Trans. p. 33. Mr. Sandoval lived with his sister in the apartment, although she was the named tenant. Trans. p. 33. The Sandovals, originally from Ecuador, moved into the apartment in January 1987.[13] Trans. p. 34–35. Both Gloria and Raphael Sandoval completed school, in Ecuador, to grade level six. Trans. p. 35. Ms. Sandoval paid rent at the

---

8. The Parties agreed to stipulate that Cohen charged the amounts of rent listed in paragraph four of the Plaintiff's Proposed Findings. Trans. p. 5–6 and 24. In addition, the Court notes that although Plaintiffs Proposed Findings lists Ms. Morales' inception date as August 1987, she stated at trial that she moved into the apartment in May 1987. *Compare* Trans. p. 25 *with* Plaintiff's Proposed Findings ¶ 4.

9. The Court notes there is again a discrepancy between the date testified (September 1987) and the date in the Plaintiff's Proposed Findings of Fact (August 1987). *Compare* Trans. p. 26 *with* Plaintiff's Proposed Findings ¶ 4.

10. The Court notes there is again a discrepancy between the date testified (July 1982) and the date in the Plaintiff's Proposed Findings of Fact

(June 1982). *Compare* Trans. p. 27 *with* Plaintiff's Proposed Findings ¶ 4.

11. The Court notes there is again a discrepancy between the date testified (October 1984) and the date in the Plaintiff's Proposed Findings of Fact (August 1984). *Compare* Trans. p. 29 *with* Plaintiff's Proposed Findings ¶ 4.

12. The Court agreed to hear the testimony of Raphael Sandoval and later determine whether it is sufficient proof in support of Plaintiff Gloria Sandoval's claim. Trans. p. 32.

13. The Court notes there is again a discrepancy between the date testified (January 1987) and the date in the Plaintiff's Proposed Findings of Fact (January 1988). *Compare* Trans. p. 34 *with* Plaintiff's Proposed Findings ¶ 4.

rate of $500 per month although the Board provided that the legal rate of rent was $209 monthly. *See* Plaintiff's Proposed Findings ¶ 4 and Exhibit P–5.

At the time Cohen purchased the property, he was aware of a rent control ordinance. Trans. p. 51 and 68–69. His understanding of the ordinance was that he could not increase rents more than six percent annually for the cost of living for existing tenants, but for new tenants, he believed he could charge fair market value rents. Trans. p. 51–52. Cohen specifically testified that he was "not aware that there was anything in the Rent Control Ordinance that would limit what [he] could charge if there was a vacancy in the building." Trans. p. 53.

Cohen formulated his understanding of the rent control ordinance from "discussions with other landlords." Trans. p. 52. His understanding, however, was not based on any formal or informal inquiry with the Rent Leveling Board in Hoboken. Trans. p. 53 and 54. Nor did Cohen ever consult with an attorney regarding the rent control ordinance, notwithstanding that he was represented by counsel at the time he purchased the Monroe Property. Trans. p. 53–54 and 72–73. Moreover, Cohen testified that he never obtained a copy of the Rent Control ordinance. Trans. p. 72.

Although Cohen never made a formal investigation of the Rent Control Ordinance with respect to the amount of rent he could charge a new tenant, he did inquire about surcharging tenants for water bills and increased taxes. Trans. p. 69–72. Apparently, in 1986 and again in 1988, taxes and water charges in Hoboken increased significantly. Trans. p. 70. Cohen was advised by other landlords that rent control could provide some relief for the increased costs. Trans. p. 70 and 71. Cohen was successful in learning that he could surcharge his tenants for increased water bills and taxes, but he testified that it never occurred to him to inquire into

the amount of rent he was permitted to charge to a new tenant. Trans. p. 70–72.

Cohen further testified, at trial, that when he received the notice of the Board's decisions regarding the Plaintiffs, he intended to contest the decisions. Trans. p. 77. He did not believe that he would be forced to have to change the rents and he sought legal advice. Trans. p. 77. The Debtor testified that thought that the determinations were not binding until he had an opportunity to rebut them. Trans. p. 78. The appeals, however, were not perfected.[14] Trans. p. 7–8.

Cohen did not reimburse any of the tenants for the amounts overcharged. Trans. p. 79. With the determination of the Rent Leveling and Stabilization Board that Cohen had been overcharging rent, the Tenants (listed above) commenced the instant adversary proceeding against the Debtor, on February 14, 1991, requesting a determination of nondischargeability with respect to the amounts of rental overcharge. In their complaint, Plaintiffs claimed that the overcharge in rents was obtained through false pretenses, a false representation or actual fraud.

At trial, the Plaintiffs' counsel withdrew the complaint as it concerned the claim of Elba Saravia. Trans. p. 32. In addition, the parties agreed to several stipulations of fact. First, the parties stipulated that the rents set forth in paragraph four of the Plaintiffs' Proposed Findings are the rents charged by the Defendant, Cohen, at the inception of the tenancy for the Plaintiffs.[15] Trans. p. 5–6. The parties agreed that the written record of the Hoboken Rent Leveling Board represents the determination that the Board made with respect to the alleged rental overcharges. Trans. p. 7.

The parties also stipulated that the Plaintiffs were month to month tenants and there was no written lease agreement between any of the Plaintiffs and the Defendant. Trans. p. 7. The parties do not dispute that all of the Tenants spoke Spanish as their native language.[16] Trans. p. 24–25.

14. The parties stipulated to this fact. Trans. p. 7–8.

15. There was no stipulation that these amounts were paid at all times during each of the Plaintiffs' tenancies. Trans. p. 6.

16. The Court permitted the use of an interpreter at trial to conduct the examination of the witnesses. The parties stipulated to the acceptability of the interpreter the Plaintiffs presented, even though she was not a certified interpreter of the

Furthermore, the parties stipulated that Cohen made no representations that the rents he charged were the legal rents under the City of Hoboken rent leveling ordinance. Trans. p. 6. The Parties also stipulated that there were no discussions, at the time the apartments were rented, between the Defendant and any of the Plaintiffs about rent control. Trans. p. 7.

Finally, the parties agreed to bifurcate the proceeding so that the Court would determine the dischargeability issue first and subsequently, if necessary, the Court would determine damages. Trans. p. 8. Accordingly, the instant decision addresses only the issue of the dischargeability of the debts owed to the Plaintiffs.[17]

## DISCUSSION

### I. Standard for § 523(a)(2)(A)

■ One of the underlying purposes of the Bankruptcy Code is to provide a debtor with a fresh start and the attendant relief from the burden of indebtedness. In light of the policy to release a debtor from virtually all existing debts, courts generally construe exceptions to discharge narrowly against the creditor and liberally in favor of the debtor. *Caspers v. Van Horne (Matter of Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987); *Horowitz Finance Corp. v. Hall (In re Hall)*, 109 B.R. 149, 153 (Bankr.W.D.Pa.1990); *In re Perez*, 94 B.R. 765, 768 (Bankr.M.D.Fla. 1988).

■ Moreover, under § 523(a) of the Bankruptcy Code, the burden of proof is placed on the creditor who is opposing dischargeability of the obligation. *Grogan v. Garner*, 498 U.S. 279, 285, 111 S.Ct. 654, 657, 112 L.Ed.2d 755 (1991); *see also In re Posta*, 866 F.2d 364, 367 (10th Cir.1989). The *Grogan* court indicated that the ordinary preponderance of the evidence standard applies in § 523, since the drafters of § 523 did not prescribe a standard of proof for the exceptions to discharge. *Grogan*, 498 U.S. at 286–87, 111 S.Ct. at 659–60.[18]

In the case at bar, the Plaintiffs contend that this Court should determine nondischargeable, under 11 U.S.C. § 523(a)(2)(A), the amount of rent the Debtor charged each of the Plaintiffs in excess of the maximum legal amount.[19] Section 523(a)(2)(A) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement representing the debtor's or other insider's financial condition. . . .

■ This section requires proof of actual fraud, not merely fraud implied in law. *Morin v. McIntyre (In re McIntyre)*, 64 B.R. 27, 29 (D.N.H.1986); *Matter of Anderson*, 10 B.R. 296, 297 (Bankr.W.D.Wis.1981) (citing

---

United States District Court for New Jersey. Trans. p. 5.

**17.** At the trial, the Court noted that the late Bankruptcy Judge Daniel J. Moore previously decided, on a pre-trial motion and by order entered September 25, 1991, that there was no right to a jury trial on the nondischargeability issue so that the Plaintiffs' request for trial by jury on the issue of dischargeability was denied. Trans. p. 8.

**18.** The preponderance of the evidence standard is used in civil actions between private parties unless "particularly important individual interests or rights are at stake," which mandate the application of a higher standard. *Grogan*, 498 U.S. at 286, 111 S.Ct. at 659 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389, 103

S.Ct. 683, 691, 74 L.Ed.2d 548 (1983)). The Supreme Court further reasoned "that a debtor has no constitutional or 'fundamental' right to a discharge in bankruptcy." *Id.* Moreover, "in the context of provisions designated to exempt certain claims from discharge, a debtor [does not have] an interest in discharge sufficient to require a heightened standard of proof." *Id.* (citations omitted). Therefore, under § 523(a), the creditor must prove by a preponderance of the evidence that the debtor committed the alleged conduct.

**19.** By its Complaint, the Plaintiffs also seek damages equal to the amount of the rent overpayment, and treble damages and reasonable attorneys' fees pursuant to the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–1 *et seq.*

*In re Taylor*, 514 F.2d 1370, 1373 (9th Cir. 1975)). The elements of actual fraud that the plaintiff must establish, by a preponderance of the evidence, to have a debt declared non-dischargeable under § 523(a)(2)(A), are: (1) that the debtor obtained money, property or services through a material misrepresentation; (2) that the debtor, at the time of the transaction, had knowledge of the falsity of the misrepresentation or reckless disregard or gross recklessness as to its truth; (3) the debtor made the misrepresentation with intent to deceive; (4) the plaintiff reasonably relied on the representation; and (5) that the plaintiff suffered loss, which was proximately caused by the debtor's conduct. *Trump Plaza Associates v. Poskanzer (In re Poskanzer)*, 143 B.R. 991, 999 (Bankr.D.N.J.1992); *Southeast Bank v. Hunter (In re Hunter)*, 83 B.R. 803, 804 (M.D.Fla.1988); *Comerica Bank–Detroit v. Nahas (In re Nahas)*, 92 B.R. 726, 729–30 (Bankr.E.D.Mich.1988); *see also Caspers v. Van Horne (Matter of Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987); *Citibank South Dakota v. Dougherty (In re Dougherty)*, 84 B.R. 653, 656 (9th Cir. BAP 1988); *Hong Kong Deposit and Guaranty Co. v. Shaheen (In re Shaheen)*, 111 B.R. 48, 51 (S.D.N.Y.1990); *Visotsky v. Woolley (In re Woolley)*, 145 B.R. 830, 833 (Bankr. E.D.Va.1991) *Citicorp Credit Services v. Hinman (In re Hinman)*, 120 B.R. 1018, 1021 (Bankr.D.N.D.1990); *Notre Dame Federal Credit Union (In re Tondreau)*, 117 B.R. 397, 400 (Bankr.N.D.Ind.1989); *Stamford Municipal Employees' Credit Union, Inc. v. Edwards (In re Edwards)*, 67 B.R. 1008, 1009–10 (Bankr.D.Conn.1986); *Chase Manhattan Bank v. Carpenter (In re Carpenter)*, 53 B.R. 724, 729 (Bankr.N.D.Ga. 1985).

In the instant case, the Debtor set forth a certain amount for rent for each of the Plaintiffs who moved into the subject building after Cohen purchased the property (the "new tenants"),[20] based on what he believed was the fair market value. The Hoboken Rent Leveling and Stabilization Board, however, clearly determined that these amounts were incorrect and illegal. Thus, this Court finds that the Debtor made a misrepresentation regarding the amount of rent.

Moreover, the new tenants reasonably relied on the representation that the amount of rent they were asked to pay was within the bounds of the law. They were fairly recent immigrants who not only were unfamiliar with the English language but also unaware of any rent control ordinance. Thus, they had no reason to believe anything other than that Cohen's representations were correct and appropriate. These tenants suffered losses proximately caused by the Debtor's conduct.

Despite the false representation and the reasonable reliance of the new tenants on Cohen's false representation, actual fraud requires knowledge of the falsity and an intent to deceive. A showing of reckless indifference will be sufficient to satisfy the knowledge element. *In re Woolley*, 145 B.R. at 834 (citations omitted); *In re Edwards*, 67 B.R. at 1010 (citing *Morimura v. Taback*, 279 U.S. 24, 33, 49 S.Ct. 212, 215, 73 L.Ed. 586 (1929)). To establish knowledge based on recklessness, "the conduct must exceed negligence and rise to the level of reckless disregard for the truth." *In re Woolley*, 145 B.R. at 834. A court may find recklessness based on a pattern of conduct or behavior. *Id.* (citing *Orval Davis Tire Co. v. Hamm (In re Hamm)*, 92 B.R. 386, 388 (Bankr.W.D.Mo. 1988)).

In addition, reckless indifference to the truth is sufficient to prove the requisite intent to deceive. *In re Edwards*, 67 B.R. at 1010 (citing *Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 656 (9th Cir.1978) and *In re Hospelhorn*, 18 B.R. 395, 398 (Bankr. S.D.Ohio 1981)); *see also Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 934 (6th Cir. 1986) (misrepresentation made with gross recklessness to truth and knowledge that it would induce loan satisfies element of intent to deceive) and *Hill v. Horst (In re Horst)*, 151 B.R. 563, 568 (Bankr.D.Kan.1993) (same). Thus, a reckless disregard of the truth of a

---

**20.** The new tenants consist of Hilda De La Cruz, Nelfo C. Jimenez, Maria Morales, Gloria Sando- val, Hector Santiago and Elvia Sequenzia.

statement will fulfill both the knowledge element and the intent to deceive element.

Furthermore, intent may be proven from the surrounding circumstances since direct proof of intent, that is, the Debtor's state of mind, is difficult to prove through direct evidence. *Matter of Van Horne*, 823 F.2d at 1287 (citations omitted). If a plaintiff provides circumstantial evidence of the debtor's state of mind, the Debtor must supply more than an assertion of honest intent to overcome the implications of the circumstantial evidence. *Id.* 1287–88 (citation omitted). If the Debtor's assertion of honest intent is unsupported, the Court must determine whether the debtor's actions "appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor." *Id.* at 1288 (quoting *In re Hunt*, 30 B.R. 425, 441 (M.D.Tenn.1983)).

■ The Court finds that the testimony presented at trial sufficiently demonstrates that Cohen *should* have been aware of the rent control ordinance. Cohen may not have had training in the management of rental property, but several incidents in his management experience should have alerted him to the fact that his building was subject to rent control.

Cohen testified that, at the time the new tenants moved into his building, he was not aware of any ordinance restricting the amount of rent he could charge a tenant moving in after he purchased the property. He did know, however, that he could not raise the rent of existing tenants by more than six percent. Initially alerted to certain rent restrictions, Cohen could have inquired about any further restrictions from such sources as the attorney representing him in the purchase of the Monroe property or even the Hoboken Board itself.

In fact, as early as 1986, Cohen had demonstrated his ability to ascertain information regarding what he could charge his tenants. He had learned, through his own investigating, that he could surcharge tenants for certain costs, such as water and taxes. Thus, he was clearly aware of the existence of the Hoboken Rent Leveling and Stabilization Board before any of the new tenants moved into the building. He should also have been alerted to the fact that this Board might have authorization over the rents he could charge.

Furthermore, Cohen operated other rental units besides the Monroe Property. Prior to 1987, Cohen had managed up to 32 units, including the Monroe property. Trans. p. 64–65.[21] Later, in November 1987, Cohen purchased property in Union City, which added eight units to his rental properties.[22] Trans. p. 65. The testimony, at trial, adequately demonstrates that, during the period that Cohen rented the apartments to the new tenants, he owned other rental units besides the Monroe Property and thus, he was familiar with the responsibilities and obligations accompanying the management of rental property.

Thus, Cohen's failure to investigate whether, and to what extent, a rent control ordinance governed the Monroe Property was not merely a careless or negligent oversight on the part of an inexperienced or naive landlord. Instead, Cohen's failure to inquire into the rent control issue and simultaneously charge new tenants what he believed to be fair market value demonstrates a reckless disregard for the truth. Cohen exhibited his ability to obtain information from the Hoboken Board where the result benefitted him and permitted him to pass on his costs. Avoiding any investigation into potential rent control, where the result could be financially detrimental to Cohen, amounts to a reckless disregard for the truth (which was that a rent control ordinance existed).

The Court's finds that Cohen's reckless disregard for the truth as demonstrated by his failure to inquire about rent control satisfies both the knowledge element and the intent to deceive element required under § 523(a)(2)(A). *See In re Edwards*, 67 B.R. at 1010.

---

**21.** Cohen testified that the eight units at the Jefferson Street Property were inoperable by January 1987. Trans. p. 65.

**22.** At trial, there was some dispute as to when Cohen purchased the 1026 South Orange Avenue property, which may have occurred anywhere from 1986 to 1988. Trans. p. 65–67.

In addition, the Court finds that the circumstantial evidence also supports a finding of the intent to deceive. Several of the facts indicate that more than likely Cohen was aware of rent control and that his building was subject to it. Cohen himself testified that he was aware of the existence of a rent control ordinance. Trans. p. 51 and 68–69. He testified that he learned some of his information from discussions with other landlords, including the prior owner of the Monroe Property. Trans. 51–52. It is highly suspect that all of these landlords were aware of the limits on increases to rent for existing tenants, the ability to surcharge tenants for certain costs and the Hoboken Board, but were not aware of the standards for rent controlled apartments. It is also questionable that when Cohen made his investigation with the Hoboken Board, he did not stumble across the fact that his building was subject to rent control.

Thus, this Court finds that Cohen's intent to deceive the new tenants can be inferred from the circumstantial evidence presented at the trial, notwithstanding the fact that Cohen asserted he was unaware of rent control placed upon the subject building. The surrounding circumstances suggest that Cohen was made aware of the potential existence of rent control standards from his discussions with other landlords and inquiries with the Hoboken Rent Leveling and Stabilization Board, even if he did not want to believe his apartments were subject to rent control. As the court in *In re Woolley* noted, "[s]elf delusion, even if existent does not justify baseless representation." *In re Woolley*, 145 B.R. at 835 (quoting *United States v. Amrep Corp.*, 560 F.2d 539, 546 (2d Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978)).

This Court concludes that all of the elements of § 523(a)(2)(A) have been met with respect to the new tenants to render the subject debts nondischargeable. Moreover, the Court concludes that sufficient proof exists in the record to include Gloria Sandoval as one of the Plaintiffs, although she did not testify at trial. The record shows that the Board made a determination that Cohen overcharged Ms. Sandoval and the parties stipulated the amount Cohen actually charged Ms. Sandoval for rent. Also, her brother testified as to when she moved into the Monroe Property.

In addition, the Court finds that, with respect to the existing tenants,[23] Cohen exhibited a reckless disregard for the truth by not investigating whether the current rent met the rent control standards. Cohen's failure to investigate this issue amounts to reckless disregard for essentially the same reasons noted for the new tenants. Cohen had been alerted to the potential rent control and should have investigated whether the prior landlord was comporting with the law. It is particularly significant that at no time during the four years of ownership of the Monroe Property did Cohen investigate the propriety of the rents he charged the existing tenants. Combined with Cohen's other experiences and the exposure to the Hoboken Board, his assumption that the prior landlord was acting according to the law without independent investigation amounts to a reckless disregard for the truth.

Although Cohen did not raise the existing tenants rent he permitted them to continue paying amounts above the legal rate, which effectively amounted to a false representation of the rent.[24] These tenants were unaware of any rent control ordinance and reasonably relied on these false representations. These tenants suffered losses proximately caused by the Debtor's conduct. The Debtor's failure to investigate the accuracy of the rents demonstrates a reckless disregard for the truth, which satisfies the knowledge and intent to deceive elements of actual fraud. The Court concludes that the elements of actual fraud, required under § 523(a)(2)(A) are satisfied with respect to the existing tenants to render the subject debts nondischargeable.

---

**23.** The existing tenants are Santia Santos and Enilda Tirado.

**24.** Cohen did not increase the base amount of rent, but did raise the rents by six percent, ostensibly to cover cost of living increases. Trans. p. 54.

**180**

### CONCLUSION

The Court finds that the debts owed the Plaintiffs: Hilda De La Cruz, Nelfo C. Jimenez, Maria Morales, Gloria Sandoval, Hector Santiago, Santia Santos, Elvia Sequenzia, and Enilda Tirado as a result of Cohen's charging of rent over the legal rental rate are nondischargeable under § 523(a)(2)(A).

The Court will address the issue of damages in a separate hearing. The trial on the Plaintiffs' damage claims will be conducted on **Thursday, December 22, 1994 at 10:00 a.m.** The parties are to file and serve pretrial memoranda regarding the issue of damages no later than ten (10) days prior to the scheduled trial date.

An Order shall be submitted in accordance with this Opinion.