73 F.3d 374
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Darren Ray SMITH and Dean Jonathan Tally, Defendant-Appellants.
 Nos. 94-5198, 94-5199.
 United States Court of Appeals, Tenth Circuit.
 Jan. 8, 1996.
 
 Before ANDERSON, BARRETT and LOGAN, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R.App. P. 34(f); Tenth Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 2
 Appellants, Dean Jonathan Talley (Talley) and Darren Ray Smith (Smith), appeal from their conviction and sentence following a jury trial on charges of conspiracy to commit wire fraud, in violation of 18 U.S.C. 371, and wire fraud, in violation of 18 U.S.C. 1343.
 
 Facts
 
 3
 In late 1992, Talley began a telemarketing business, Worldwide Protection (Worldwide), in Tulsa, Oklahoma. Talley was the president of Worldwide which employed 34 representatives to answer the telephones. Smith co-managed the shipping department and was co-owner of the company. Worldwide was an inbound business where potential customers called after receiving a postcard in the mail.
 
 
 4
 In September, 1992, Talley met Kenneth Abrams (Abrams). Abrams had created a credit card protection program for use in telemarketing. The program required a customer to complete a registration form listing all their credit card information. If the customer had their credit cards lost or stolen, they could call an 800 number and the banks would be notified of the lost or stolen cards. In addition, if the customer was more than 200 miles from home when this occurred, they would be wired $300, as a 25-day interest free loan. Abrams gave Talley the exclusive right to sell the program and sold Talley 3,585 programs for $10 each.
 
 
 5
 After purchasing the credit card protection programs from Abrams, Worldwide sent out 600,000 postcards to potential customers throughout the United States. The postcard stated that the recipient was guaranteed to win one of five prizes, including a 1992 Ford Taurus, a Hawaiian vacation, a $2,500 cashier's check, or a complete Sony home stereo system and color television or $1,500 cash. The only prize ever awarded was the Hawaiian vacation which was actually a travel brochure from a California travel agency which provided that the recipient was eligible for a free vacation upon the purchase of a full coach airfare ticket.
 
 
 6
 Individuals who responded to the postcard spoke with representatives of Worldwide. Talley trained his representatives to read from a prepared script which was similar to scripts used by Talley in prior telemarketing businesses. The representatives were also given a list of rebuttals to make in response to questions or comments by the callers. The callers were informed they were guaranteed one of the four major prizes and each customer was offered the bonus award, a Movado style diamond watch. After the callers were told they would receive the major prize within 10 to 14 days, the representative would explain the credit card protection program. Callers were told that the three-year membership in the program provided 24-hour protection against illegal charges on lost or stolen credit cards and emergency cash for thirty days interest free. The cost of the program ranged between $149.50 and $179.50. Callers were told that the purchase price of the credit card protection program could be electronically debited from their bank account. After the representative spoke to the caller, another individual, the verifier, would get on the line and confirm what the caller had been told and the bank account information. Talley and Smith both periodically worked as verifiers. When sales were successful, the callers' bank accounts were debited within twenty-four hours of the telephone calls to Worldwide. As a result, Worldwide received the money before the caller received the prize, bonus award, or the credit card protection program information.
 
 
 7
 In order to use the electronic debit method, Talley entered into an agreement with Jerry Frederico of Electronic Transfers Associates (ETA) in Waco, Texas. ETA would verify the account information and collect the money from the caller's account. From October, 1992, to June, 1993, ETA, through information provided by Worldwide, had 18,527 transactions. Of those, 14,019 accounts were debited for a total amount of $2,378,635. Due to refunds or bank rejections, the number was reduced to 8,529 transactions and the net total sent to Worldwide by ETA was $1,158,228.
 
 
 8
 A number of callers had complaints about Worldwide. Some callers believed they were deceived about the nature of the prizes, especially the Hawaiian vacation where they were not informed they would have to purchase a full coach fare in order to redeem the brochure. Others were assured their bank account would not be debited until they received their prizes or until they signed an authorization/security release form. Some callers never received anything although their bank accounts were debited. When callers called to register their complaints, they were given the telephone number of the customer service department and the fictitious name "Mike Thomas" as the head of the department. "Mike Thomas" was the fictitious name used by Talley and others who worked in the customer service department.
 
 
 9
 An employee of Worldwide's, Marcia Muchnick, became suspicious that Worldwide was deceiving its callers. She reported her suspicions to the Federal Bureau of Investigations (FBI). Another employee, Charles Smallwood, also began passing information to the FBI. On May 25, 1993, the FBI executed a search warrant at Worldwide's business premises. On June 11, 1993, Talley ceased Worldwide's business operations.
 
 
 10
 On December 9, 1993, Talley and Smith were charged in a twelve count indictment with conspiracy to commit wire fraud and mail fraud (Count I), in violation of 18 U.S.C. 371, and wire fraud for the purposes of executing a scheme and artifice to defraud (Counts II-XII), in violation of 18 U.S.C. 1343. On June 1, 1994, Talley and Smith were found guilty by a jury on all counts.
 
 
 11
 On October 21, 1994, Smith was sentenced to 24 months imprisonment followed by a three-year term of supervised release and assessed a $10,000 fine. On October 24, 1994, Talley was sentenced to 51 months imprisonment followed by a three-year term of supervised release and was assessed a $25,000 fine.
 
 Issues
 
 12
 On appeal, appellants contend that the district court erred in: (1) admitting into evidence statements made by employees of Worldwide, and (2) not using the "net" loss to the victims or the "net" value of property received in calculating the loss for sentencing guideline purposes.
 
 Discussion
 I.
 
 13
 Appellants contend that the district court erred in admitting into evidence the statements made to callers by employees of Worldwide because there was insufficient proof that Talley or Smith authorized or ratified the employees' representations. Evidentiary rulings rest within the sound discretion of the district court, and we review only for an abuse of discretion, United States v. Tome, 61 F.3d 1446, 1449 (10th Cir.1995), including decisions whether to allow the testimony of coconspirators. United States v. Brown, 943 F.2d 1246, 1254 (10th Cir.1991). "Under this deferential standard of review, a trial court will be reversed only if we have a firm and definite belief that the trial court made a clear error in judgment." Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1433 (10th Cir.1993). However, in determining the sufficiency of the evidence, we review the record de novo, viewing the evidence in the light most favorable to the government. United States v. Urena, 27 F.3d 1487, 1489 (10th Cir.), cert. denied, --- U.S. --- (1994).
 
 
 14
 The district court allowed the callers/victims to testify regarding statements made to them by Worldwide employees as coconspirators statements pursuant to Fed. R. of Evid. 801(d)(2)(E). The court concluded that there was sufficient evidence of a conspiracy involving Talley, Smith, and their employees. The district court found that the statements of the agents/employees made to the callers were in furtherance of the conspiracy, done with the approval of the appellants, and were thus not hearsay. Therefore, the court ruled that since the agents/employees were coconspirators their statements were admissible as coconspirators statements under Fed. R. of Evid. 801(d)(2)(E).
 
 
 15
 We agree that the statements and representations complained of were not hearsay. They were not offered to prove the truth of the matters asserted and, indeed, the Government contends that the statements were essentially false. Since the Government sought to prove the making of the statements but not the truth of the matters asserted by them, there is no actual hearsay question. See United States v. Krohn, 573 F.2d 1382, 1386 (10th Cir.), cert. denied, 436 U.S. 949 (1978) (citing Anderson v. United States, 417 U.S. 211, 219 (1974)). There is, however, the parallel question of whether appellants are responsible for the acts and statements of the agents or employees of a fraudulent enterprise. Krohn, 573 F.2d at 1387.
 
 
 16
 The governing rules are well settled. Statements and representations by salesmen which are expressly or impliedly authorized or ratified by the person against whom they are offered may be admitted, although the salesmen are not alleged to be parties to the fraudulent scheme. Krohn, 573 F.2d at 1386. See Beck v. United States, 305 F.2d 595, 600 (10th Cir.), cert. denied, 371 U.S. 890 (1962); United States v. AMREP Corp., 560 F.2d 539, 545 (2nd Cir.1977), cert. denied, 434 U.S. 1015 (1978). The authorization by the appellants of such statements or representations may be found in the circumstances of the particular case, in the scope of the plan or scheme, and from other pertinent facts. Krohn, 573 F.2d at 1386; Beck, 305 F.2d at 600. In addition, the nature of a scheme to defraud by false representations may be shown by accumulated evidence of actions of the agents and subsequent conduct and correspondence of the enterprise involved which demonstrates a course of business, an important feature of which is systematic misrepresentations by the agents. Krohn, 573 F.2d at 1387; United States v. Taylor, 832 F.2d 1187, 1193 (10th Cir.1987). See United States v. Ranney, 719 F.2d 1183, 1187 n. 7 (1st Cir.1983) ("It is clear that, despite his innocence, a salesman's representations may still form part of his employer's scheme to defraud, if the employer authorized the representations and intended them to deceive prospective customers into parting with value."); United States v. Toney, 605 F.2d 200, 208 (5th Cir.1979) ("It has long been the established rule ... that statements and acts of agents of codefendants are admissible as against all participants in the scheme."), cert. denied, 444 U.S. 1090 (1980); AMREP, 560 F.2d at 545 ("[S]tatements and representations made by the sales representatives in furtherance of the scheme are admissible against the [employer] ... even though the salesmen themselves are not participants in the fraudulent scheme.").
 
 
 17
 Viewing the evidence in the light most favorable to the government, we hold that there is sufficient evidence that appellants expressly or impliedly authorized or ratified the statements made by their employees to callers. Talley trained his employees to read from a prepared script when talking with callers. He, or one of his managers, instructed the employees not to deviate from the script. Employees were even provided with a list of rebuttals with which to respond to caller questions and comments. Smith was co-manager and co-owner of Worldwide with Talley and, as such, is co-liable. Accordingly, the district court did not abuse its discretion by allowing the callers/victims to testify regarding the statements made to them by Worldwide's employees.
 
 II.
 
 18
 Appellants contend that the district court erred in not using the "net" loss to the victims or the "net" value of the property received in calculating the loss for sentencing guideline purposes.
 
 
 19
 In the presentence report, the intended loss for sentencing guideline purposes was calculated at $2,585,640 based on 14,019 intended "victims" who suffered a loss of between $149.50 to $179.50. The report also stated that the net actual loss to the victims was $1,315,151 and the actual number of victims was 8,529. Based on the intended loss of $2,585,640, the probation officer calculated appellants' base offense level pursuant to U.S.S.G. 2F1.1(b)(1)(N). The loss figures were based on the evidence presented at trial, especially the evidence provided by ETA. The district court reduced the intended loss by approximately $207,005 which had been included in the report but was "loss" associated with a separate alleged telemarketing scheme based in Florida and not charged in the indictment. The district court otherwise adopted the findings of the presentence reports and overruled the appellants' objections to the method of calculating the loss.
 
 
 20
 "We review the district court's determination of a U.S.S.G. 2F1.1 loss under the clearly erroneous standard, but the factors a district court properly may consider is reviewed de novo." United States v. Gallegos, 975 F.2d 710, 712 (10th Cir.1992); United States v. Levine, 970 F.2d 681, 690 (10th Cir.), cert. denied, --- U.S. --- (1992).
 
 
 21
 In its application of U.S.S.G. 2F1.1, the district court adopted the probation officers's position in the presentence report that the appropriate loss valuation for computation of the specific offence characteristics was the intended loss. Under the guidelines, a defendant's base offense level is increased by the value of the loss for offenses involving fraud or deceit. U.S.S.G. 2F1.1(b)(1). In determining the amount of the loss, the district court may use either the actual loss or the intended loss, whichever is greater. U.S.S.G. 2F1.1, Application Note 7; United States v. Smith, 951 F.2d 1164, 1166 (10th Cir.1991) ("Where there is no [actual] loss, or where actual loss is less than the loss the defendant intended to inflict, intended or probable loss may be considered.").
 
 
 22
 In this case, the presentence report clearly showed that the intended loss was greater than the actual loss. Therefore, the district court did not err in using the intended loss figure for sentencing guideline purposes. Additionally, there is ample evidence to support the district court's calculation of intended loss; therefore, the district court's determination is not clearly erroneous.
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. Citation of unpublished orders and judgments is not favored. Nevertheless, an unpublished decision may be cited if it has persuasive value with respect to a material issue that has not been addressed in a published opinion and it would assist the court in its disposition. A copy of the decision must be attached to the brief or other document in which it is cited, or, if cited in oral argument, provided to the court and all other parties