**In re George A.C. WOOLLEY, III, Debtor.**

**Thomas L. VISOTSKY, Plaintiff,**

v.

**George A.C. WOOLLEY, III, Defendant.**

**Bankruptcy No. 90–32439–T.**
**Adv. No. 90–3189–T.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

March 29, 1991.

Charles L. Williams, Christopher M. Malone, Thompson & McMullan, Richmond, Va., for plaintiff.

James F. Pascal, Richmond, Va., for debtor, defendant.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

### Introduction and Procedural Background

The plaintiff, Thomas L. Visotsky, initiated this adversary proceeding on September 30, 1990, pursuant to § 523(a)(2)(A) of the Bankruptcy Code. His complaint seeks exception from discharge of a state court judgment against the debtor, George A.C. Woolley, III, involving the sale of a security based on an untrue statement.

Plaintiff moved for summary judgment pursuant to Bankruptcy Rule 7056. At the conclusion of a hearing on this motion held January 16, 1991, this court awarded partial summary judgment for plaintiff finding that: (1) debtor made a false representation; (2) plaintiff relied on the representation; and (3) plaintiff was damaged as a result of the representation.

On January 22, 1991, trial was held on two remaining issues: (1) whether debtor knew that the representation was false when made and (2) whether debtor made the representation with the intent to deceive the plaintiff.

Based upon the facts and conclusions stated in this opinion the court holds that plaintiff's judgment against the debtor is excepted from discharge.

### Findings of Fact

In July 1986, Woolley began employment with L & A Petroleum, Inc., an oil and gas development firm based in Richmond. Previously, Woolley held financial management positions with two major Richmond corporations and taught at a local university from which he received a master's degree in business administration.

L & A Petroleum was controlled by Lance A. Lastinger, President. In addition to Lastinger there were three other full time employees in the headquarters office, including Woolley. Woolley, whose title was Vice President, was responsible for the marketing of drilling programs to the investment public.

Woolley contacted Visotsky in early September 1986 to solicit an investment in a joint venture for drilling an oil and natural gas well known as Holligan 2. The prospectus for this joint venture, dated February 21, 1986, described the project as a $1,200,000.00 drilling program on property located in Brazos County, Texas. Initial drilling had begun in July 1986.

Woolley mailed a Holligan 2 prospectus to Visotsky on September 3, 1986. The prospectus included data on L & A Petroleum's recently-marketed Holligan 1 drilling program on a property adjacent to the site for Holligan 2. (The marketing of Holligan 1 had been concluded before Woolley joined L & A Petroleum.) In the margin of the prospectus, Woolley wrote the following statement concerning Holligan 1: "This well is currently doing about 900 BBL [barrels]/day."

During the solicitation period Woolley on two or three occasions made similar oral representations to Visotsky concerning the 900 barrel per day production of Holligan 1.

In his statements to Visotsky concerning the 900 barrel per day production of Holligan 1, Woolley primarily relied on oral representations to this effect made to him by Lastinger. It was Lastinger's practice to hold weekly meetings with the other three Richmond employees at which time he would give them production information. That information was then typically sent to investors in form letters prepared by Lastinger but often signed by the individual L & A Petroleum sales representatives.

According to an administrative assistant for L & A Petroleum, Lastinger regularly received, often on a weekly basis, accurate written production reports from the well sites in Texas. These reports were usually placed in the company files. In fact, and as revealed by these production reports, the production of oil by Holligan 1 was considerably less than the 900 barrels a day represented by Woolley to Visotsky. Woolley testified that he did not become aware of the existence of these documents until after Lastinger left the company in June 1987.

On his typed cover letter to Visotsky accompanying the prospectus, Woolley wrote in the margin: "This is as far from wildcatting as you can get." During the sales negotiations, Woolley also offered to provide Visotsky a guarantee from L & A Petroleum of his proposed investment in Holligan 2.

Woolley also sent to Visotsky a packet of L & A Petroleum investor update letters relative to Holligan 1, including a letter dated September 17, 1986. This letter stated that "frac water" was being recovered from Holligan 1, and "[w]e are allowing the well to produce at about 100 barrels of fluid per day." The evidence is inconclusive as to whether Visotsky received this letter before or after he invested in Holligan 2.

Visotsky invested $30,000.00 in Holligan 2 on September 30, 1986. Although drilling of the site was completed in October 1986, the well was plagued with difficulties and never produced sufficient oil to become commercially viable. Visotsky continued to receive investor updates concerning Holligan 2, including a letter from Woolley dated May 20, 1987, stating "total return on this investment will be excellent".

In December 1987, Visotsky received a check for $28.56 representing his share of Holligan 2 production revenue. He received no additional payments on his investment.

In the spring of 1987 Woolley learned from Lastinger that there were "some problems" with both Holligan 1 and 2. However, Woolley did not inform Visotsky of the problems with either Holligan 1 or 2.

In late May or early June 1987, Lastinger left the company and the three remaining Richmond employees attempted to reorganize and seek new investors to complete development of Holligan 2. This effort was not successful, and the company ceased operations in late 1987.

Visotsky filed a civil complaint against Woolley in the Circuit Court of the City of Richmond in February 1989, alleging violation of Va.Code Ann. § 13.1–522(C) (Repl.Vol.1989), a securities broker liability statute. Following trial under this complaint, the circuit court ruled that Woolley sold a security to Visotsky by means of an untrue statement of a material fact. As part of the ruling, the circuit court found that Woolley failed to sustain the burden of proof imposed on him by § 13.1–522(C) that he did not know and in the exercise of reasonable care could not have known of the existence of the untrue statement. *Visotsky v. Woolley*, Case No. N–6145–4, Circuit Court of the City of Richmond (1990). Accordingly, the circuit court entered judgment against Woolley on June 19, 1990, for the value of the investment, $30,000.00, less the return of $28.56. The court also awarded Visotsky attorneys' fees and interest of 6% per annum interest on the unpaid judgment.

On August 7, 1990, Woolley filed a Chapter 7 bankruptcy petition.

### Discussion

Plaintiff bases his dischargeability complaint on 11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code which provides in part:

(a) A discharge under Section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, ... to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud....

11 U.S.C. § 523(a)(2)(A) (1991). The false representation or fraud relied upon by the plaintiff is Woolley's statement on several occasions that the adjoining well, Holligan 1, was producing 900 barrels of oil per day when in fact it was producing substantially less.

Plaintiff must prove the following five elements to establish non-dischargeability under § 523(a)(2)(A): (1) the debtor made false representations; (2) that at the time he knew the representations were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made. *Sweet v. Ritter Fi-*

*nance Co.,* 263 F.Supp. 540, 543 (W.D.Va. 1967), *cited in Ward v. Wyatt (In re Wyatt),* 87 B.R. 874, 877 (Bankr.E.D.Va. 1988).

▆ In determinations of dischargeability under § 523(a)(2)(A), collateral estoppel may bar relitigation of issues resolved in state court. *Krenowsky v. Haining (In re Haining),* 119 B.R. 460, 464 (Bankr.D.Del. 1990). As stated above, this court granted summary judgment for plaintiff for the 1st, 4th and 5th elements based on the state court proceeding.

However, Va.Code Ann. § 13.1–522(C) (Repl.Vol.1989) under which the state court judgment lies, does not require a finding of intent to deceive.[1] Therefore, neither intent nor knowledge was established at the state court proceeding, and summary judgment was not available as to the 2nd and 3rd elements.

▆ From an evidentiary perspective, a state court record is relevant and admissable in a § 523(a)(2)(A) dischargeability proceeding where the testimonial and documentary evidence concerns the same parties, transactions, and occurrences. *In re Haining* at 462. Therefore, the state court record in the earlier *Visotsky v. Woolley* litigation is admissible in this bankruptcy proceeding and may be considered by the court in ruling on the complaint.

▆ The appropriate standard of proof for plaintiff in an exception to discharge case is the preponderance of the evidence standard. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Knowledge*

Here, the defendant Woolley testified that at the time he made the representations concerning production of the adjoining well, he believed the statements to be true and that he did not learn the truth until much later. His defense is that he relied on Lastinger's representations. Con-sequently, he argues that he did not have the requisite knowledge or intent to defraud Visotsky.

▆ However, plaintiff may establish debtor's *actual* knowledge by a showing of reckless indifference to the truth. *Stamford Mun. Employees' Credit Union, Inc. v. Edwards (In re Edwards),* 67 B.R. 1008, 1010 (Bankr.D.Conn.1986) (emphasis added). The knowledge element for exception to discharge is satisfied if the debtor's representation was known to be false or recklessly made without knowing whether it was true or false. *In re Taylor,* 514 F.2d 1370, 1373 (9th Cir.1975), *cited in Mann v. Houtman (In re Houtman),* 568 F.2d 651, 655 (9th Cir.1978); *Birmingham Trust Nat'l Bank v. Case,* 755 F.2d 1474, 1476 (11th Cir.1985).

▆ Reckless conduct refers to unreasonable conduct in disregard of a known or obvious risk from which it is highly probable that harm would follow. *W. Page Keeton, William A. Prosser & W. Page Keeton on Torts,* 213 (5th ed. 1984). It is usually accompanied by a conscious indifference to the consequences. *Id.* In contrast, negligence is characterized as mere thoughtlessness or inadvertence or simple inattention. *Id.* at 214.

▆ Where the knowledge element is based on recklessness, the conduct must exceed negligence and rise to the level of reckless disregard for truth. *Arney v. Moran (In re Moran),* 120 B.R. 379, 390 (Bankr.W.D.Va.1990). Recklessness is usually determined by a pattern of conduct. *See Orval Davis Tire Co. v. Hamm (In re Hamm),* 92 B.R. 386, 388 (Bankr.W.D.Mo. 1988).

▆ Predictions or opinions as to anticipated profits that the declarant does not in fact hold or declarations made with reckless indifference for the truth may bar a discharge in bankruptcy. *McMillan v. Firestone (In re Firestone),* 26 B.R. 706,

---

1. The statute provides that one who "materially aids" in the sale of a security by means of an untrue statement is liable "unless able to sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have know, of the existence of the facts by reason of which the liability is alleged to exist." It thus shifts the burden of proof on knowledge to the defendant.

715 (Bankr.S.D.Fla.1982); *Chase Manhattan Bank v. Fordyce (In re Fordyce),* 56 B.R. 102, 105 (Bankr.M.D.Fla.1985). In concluding that defendants' beliefs concerning the accuracy of the representations were not honestly held, the Firestone Court noted that "[s]elf delusion, even if existent does not justify baseless representations." *U.S. v. Amrep Corp.,* 560 F.2d 539, 546 (2d Cir.1977), *cert. den.,* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1977) *cited in McMillan v. Firestone (In re Firestone),* 26 B.R. at 716.

■■■ Reckless reliance by a debtor on the statements of another may be grounds for non-dischargeability even where the debtor had no actual knowledge that the statements made to plaintiff were false. *In re Houtman,* 568 F.2d at 656; *David v. Annapolis Banking & Trust Co.,* 209 F.2d 343, 344 (4th Cir.1953). *See In re Sweet,* 263 F.Supp. at 543.

Although Woolley made repeated statements that Holligan 1 produced 900 barrels per day he testified that he sent the September 17, 1986, letter to Visotsky before he made the investment on September 30, 1986. That letter stated that current production of Holligan 1 was only 100 barrels a day. From this alone, the court easily concludes that Woolley's misrepresentations were made with reckless indifference. The truth was literally in his hands.

Woolley's written statement on the cover letter accompanying the prospectus stated: "This is about as far from wildcatting as you can get." This was a prediction concerning profits. Yet Woolley made it clear that he had no way of knowing whether the statement was reasonably accurate. Woolley testified that he knew nothing about the oil and gas industry. He made no investigation of data on which to make his profit/risk statements about Holligan 2. For over one year he never inquired about any production data on either Holligan 1 or 2. Woolley must have known that his continuing representations, on which Visotsky relied to his detriment, had no reasonable factual basis.

Woolley's conduct demonstrated a consistent pattern of misrepresentation. His "900 barrel per day production" statement was made repeatedly. After Visotsky made the investment on September 30, 1986, Woolley continued to provide him with a series of exaggerated production figures. As late as May 20, 1987, Woolley sent a letter to Visotsky stating that the total return on his investment in Holligan 2 would be "excellent". His decision not to inform Visotsky of the production troubles in Holligan 1 and 2 was reckless and in conscious indifference to the consequences.

■■■ In an exception to discharge case, the court may consider the debtor's conduct in light of his prior business expertise. *See Livingston v. Hospelhorn (In re Hospelhorn),* 18 B.R. 395, 398 (Bankr.S.D.Ohio 1981). Woolley's conduct must be evaluated in view of his advanced business degree, his previous position as a member of the business faculty at a local university and prior employment in financial management with two of the largest corporations in Virginia. This court concludes that his actions in this matter were not simply negligent but rather a reckless disregard for the truth. Plaintiff has established the knowledge element for exception to discharge.

*Intent*

■■■ The conclusion that defendant knew that his representations were false is closely linked to the issue of intent to deceive. In a § 523(a)(2)(A) proceeding intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to invest. *See First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey),* 761 F.2d 421, 424 (7th Cir.1985). A defendant who asserts a fact to be of his own knowledge, or so positively as to imply that he has knowledge, when he knows that he does not in fact know whether what he says is true, is found to have the intent to deceive. *Prosser* at 742.

■■■ As with the knowledge element required for exception to discharge, a showing of reckless indifference to the truth is sufficient to demonstrate the requisite intent to deceive. *In re Edwards,* 67 B.R. at 1010; *In re Hospelhorn,* 18 B.R. at 398; *In re Houtman,* 568 F.2d at 656. "[W]here, as here, a person knowingly *or recklessly* makes a false representation which the per-

son knows or should know, will induce another to make a loan, intent to deceive may logically be inferred." *Carini v. Matera,* 592 F.2d 378, 380 (7th Cir.1979) (emphasis added) *cited in In re Firestone,* 26 B.R. at 717. *But see Cowher's Trucking, Inc. v. Zack (In re Zack),* 99 B.R. 717, 722 (Bankr. E.D.Va.1989), where Chief Judge Bostetter of this district held that negligence or reckless disregard for the truth is not sufficient to establish the intent to deceive element for exception to discharge.

▮ In a dischargeability action under § 523(a)(2)(A) intent may be inferred from evidence presented of the surrounding circumstances of the case. *In re Wyatt,* 87 B.R. at 878; *Eastern Food Service, Inc. v. Leger (In re Leger),* 34 B.R. 873, 877 (Bankr.D.Mass.1983); *In re Hamm,* 92 B.R. at 388. This is so because direct proof of intent, i.e. debtor's state of mind, is nearly impossible to obtain. *In re Leger,* 34 B.R. at 877; *In re Edwards,* 67 B.R. at 1010. The false representation coupled with the debtor's conduct is sufficient to permit the court to infer the requisite intent. *Id.* However, while intent to deceive may be inferred from the totality of the circumstances, it cannot be presumed. *Schwalbe v. Gans (In re Gans),* 75 B.R. 474, 486 (Bankr.S.D.N.Y.1987).

▮ In determining whether there was intent to deceive, the court may rely on a pattern of representations to infer intent. *In re Firestone,* 26 B.R. at 717. Subsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent. *In re Haining,* 119 B.R. at 464.

Intent was inferred where the court was satisfied that the debtor was "willing to paint as bright a picture as might be necessary" to induce an investment from the plaintiff". *In re Moran,* 120 B.R. at 390. "The emphasis of this [intent] element in a § 523(a)(2)(A) discharge is on the debtor's intention to induce action by the creditor as a direct result of the debtor's representation." *Norton Bankr.L. & Prac.,* § 27.41 (1990).

This court infers the requisite intent from Woolley's pattern of misrepresenta-

tions concerning the production of Holligan 1. Furthermore, Woolley admitted that when Lastinger told him in late spring 1987 about problems with both Holligan 1 and 2, he withheld this information from Visotsky.

Woolley's representations about the production of Holligan 1, the absence of "wildcatting" risk in Holligan 2, and his offer to provide a guarantee of the investment all suggest an intent to do whatever was necessary to induce Visotsky to invest. Woolley's representations were directly focused on inducing Visotsky to invest.

Despite his assertions at trial, Woolley did not overcome the depth of the circumstantial evidence presented by plaintiff. In § 523(a)(2)(A) discharge cases "[w]hen the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor 'cannot overcome [that] inference with an unsupported assertion of honest intent.'" *In re Hamm,* 92 B.R. at 38 (quoting *Matter of Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987)).

The plaintiff has carried his burden of proof of establishing the nondischargeability of his claim under Section 523(a)(2)(A) of the Bankruptcy Code. An appropriate order will be entered.