In a re George G. FINCH, Debtor.

Andre and Gail Redmond, Plaintiffs,

v.

George G. Finch, Defendant.

Bankruptcy No. 00–61796.
Adversary No. 01–02080.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Feb. 28, 2003.

**640**

Robert E. Giffin, Robert E. Giffin Co. LPA, Columbus, OH, for Plaintiffs.

Eleanor Beavers Haynes, Haynes & Haynes, Columbus, OH, for Defendant.

Alexander G. Barkan, Columbus, OH, Assistant U.S. Trustee.

### MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

The Court submits this Memorandum Opinion and Order as its findings of fact and conclusions of law. Andre and Gail Redmond ("Plaintiffs") obtained a $362,000.00 judgment against George G. Finch ("Defendant"), and his spouse. The judgment is related to the Defendant's sale of a home to the Plaintiffs in 1994 and a severe insect infestation. In addition to this judgment, the Plaintiffs have also now asserted that there were undisclosed structural and water problems with the basement.

The Plaintiffs seek to block the discharge of the judgment and alleged additional damages, by asserting that they were defrauded and willfully and maliciously injured by the Defendant in his sale of the home. 11 U.S.C. § 523(a)(2)(A) and (6) ("Code").[1] The Court has consid-

---

1. These sections provide:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

ered the testimony, exhibits, statements of counsel, memoranda of law, and has concluded that section 523(a)(6) is not applicable. On the other hand, the Court has concluded that the Plaintiffs have sustained their burden of proof under section 523(a)(2)(A), and their judgment is nondischargeable. A history of the dispute will illustrate the bases for this decision.

The Defendant, his wife, Phyllis Finch ("Mrs.Finch") and a son, resided in a home located at 5260 Berkshire, Detroit, Michigan. The home was built in 1938, and was purchased by the Defendant and his wife in 1984. In December 1987, the basement of the home was waterproofed, with a lifetime warranty, and about a year and a half later it was converted to a family room. In April 1994, the Plaintiffs and the Defendant and Mrs. Finch entered into a purchase contract for the home. Although the Defendant was a licensed real estate agent at the time, he was represented by a realtor. His real estate license was in escrow with the realtor, and as a result he received a modest commission on the transaction. The Defendant sold jewelry for Service Merchandise. The Plaintiffs were represented by an agent. The Plaintiff, Mr. Redmond, has a bachelor's degree in business administration, and is employed as an accountant for the city of Detroit. The Plaintiff, Mrs. Redman, was employed at the time of the real estate transaction, but is now on Social Security disability.

The Plaintiffs visited the home on three occasions. The first visit occurred on an early afternoon in April 1994, and lasted approximately twenty-five minutes. The Plaintiffs, along with their agent, were provided a thorough tour of the home by the Defendant. The tour started in the basement. During this visit, the Defendant testified that he told the Plaintiffs and their real estate agent that the basement had been repaired and waterproofed. The Defendant testified that he demonstrated how the carpet squares in the basement could be easily moved. He testified that the basement served as a family room that included furniture, stereo equipment, and a fireplace.

Around 6:00 p.m. on the same day of the initial visit, the Plaintiffs made an offer at the full listing price. The Plaintiffs testified they were led to believe that a lower price would not be accepted in view of the renovations to the home. The Plaintiff, Mr. Redmond, testified that he was led to believe there were no problems with the home. Mr. Redmond testified that at the time of the transaction, the Michigan seller's disclosure law had just become effective, and that they relied on this law to protect their interests. The Plaintiffs executed the seller's disclosure form on April 7, 1994, and eleven days later, on April 18, 1994, it was completed and signed by the Defendant and his wife. Apparently, the form was signed by the Plaintiffs in blank, which means that at the time of the execution of the real estate purchase contract there was no effective disclosure of the condition of the home.[2] In addition, the

---

...
    (6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ...
To establish that a debt is nondischargeable under section 523, creditors must prove their case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**2.** *See generally,* Steven C. Tyszka, "Remnants of the Doctrine of Caveat Emptor May Remain Despite Enactment of Michigan's Seller Disclosure Act," 41 Wayne L.Rev. 1497 (1995) (author discusses history and purpose of the Michigan real estate sale disclosure law).

Plaintiffs never obtained their own, independent inspection of the home.[3]

The second visit to the home occurred several months later, in August 1994. This amount of time elapsed because the sale was subject to a mandatory inspection by the city of Detroit. In this process, various problems were found. By law, they had to be corrected before the transaction could close. The items included replacement of the furnace, tuck pointing, the shuttering of basement windows, removal of a space heater, repairs to the driveway and garage floor, removal of an unused toilet in the basement, and gutter replacement.

By August 1994, the work, including the installation of a new furnace, had been completed. The Defendant recalls that the Plaintiffs and their children visited the home to view the repairs. During this second visit that lasted approximately forty minutes, Mr. Redmond noticed that the new furnace did not have a humidifier that was present before. As a result, the Defendant had a humidifier installed. In addition to the city of Detroit inspection, a routine pest inspection was required prior to closing. Also, the Farmers Home Administration, that financed the sale, conducted an inspection.

In August 1994, the transaction closed with a ten-day period to transfer possession. The Defendant testified that at the closing, he gave the Plaintiffs the waterproofing warranty. Immediately after closing, the Plaintiffs briefly visited the home to take another look, for a third and final time. In the moving process, the Defendant and his wife testified that they

remained in the home and even slept on the floors. During this ten-day period, however, Mrs. Finch noticed that one of her three cats had fleas. Immediately, she had the cats treated and boarded by a veterinarian. Also, she immediately purchased and utilized spray and bomb insecticide products obtained from the veterinarian.

Mrs. Finch testified that this was the first time she noticed fleas. The Defendant and Mrs. Finch testified that no one in their family was bitten by fleas. Both of the Plaintiffs testified that during their visits to the home, prior to possession, they also never noticed fleas. The Plaintiff, Mr. Redmond, however, testified that the cats were confined to the basement, and they appeared to be sick. The day after the home was vacated by the Defendant and his family, Mr. Redmond entered to shampoo the carpeting. It was at this point that he was severely bitten by fleas.

When his family moved in, they were also bitten, including his wife, who suffered the most severe reactions. The Plaintiff, Mrs. Redmond, testified that she developed sores and fevers, and that she lost her hair. Mrs. Redmond testified that due to the amount of sick leave used, she lost her job. She is now on Social Security disability, as a result of her injuries. According to her testimony, Mrs. Redmond also now suffers from depression. The infestation became so severe that the Plaintiffs rented an apartment on a temporary basis for Mrs. Redmond and their children. The Plaintiffs entered into a contract with Orkin, and Mr. Redmond testified it took more than a year to bring

---

**3.** Commentators have recognized that even with the advent of seller's disclosure laws that purchasers remain obligated to protect their own interests by obtaining, "... a complete inspection of the physical condition of the property ... A buyer that is not familiar with

building components and systems should hire a professional inspector ...." Katherine A. Pancak, Thomas J. Miceli and C.F. Sirmans, "Residential Disclosure Laws: The Further Demise of Caveat Emptor," 24 Real Est. L.J. 291, 319 (1996).

the problem under control. Orkin supplied the Plaintiffs with brochures that stress the difficulty of remedying flea infestations, especially in carpeting and upholstered furniture. Further, the brochures indicate that the efficiency of pesticides varies with the life cycles of the pests.

The Plaintiffs also sought assistance from the Defendant's realtor. The realtor promised to set up a meeting between the Plaintiffs and Defendants. The realtor also promised to pay for the extermination. No meeting was ever called, and the realtor apparently never paid. Approximately two weeks after moving in, and after the Plaintiffs called the realtor, Mrs. Finch returned to the home. According to her testimony, the purpose of the visit was to retrieve mail. At that time, she was confronted with the infestation. Mrs. Redmond testified that Mrs. Finch was wearing sandals, and that she was frightened to step into the home. Mrs. Finch, on the other hand, testified that she was simply not invited to sit down, and left quickly. Mrs. Finch testified, however, that she was horrified by what she was told by the Plaintiffs, and later returned with the unused portion of the pesticides.

In addition to the infestation, the Plaintiffs testified that subsequent to possession they discovered that the basement walls leaked, and that there were structural problems. The Plaintiff, Mr. Redmond, testified that approximately a year after closing, there was a flood in the basement. Mr. Redmond testified that when they had the basement repaired, he was informed by a contractor that the earlier waterproofing was not done correctly. Contrary to the testimony of the Defendant, Mr. Redmond testified that he never received a copy of the waterproofing warranty. The Plaintiff, Mr. Redmond, ultimately filed bankruptcy as a result of all of the financial strains related to the home.

■ Regarding the false pretenses and false representation provision of the Code (section 523(a)(2)(A)), it must be shown that:

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;

(2) the debtor intended to deceive the creditor;

(3) the creditor justifiably relied on the false representation; and

(4) its reliance was the proximate cause of the loss.

*In re Rembert,* 141 F.3d 277, 280–281 (6th Cir.1998), *cert. denied* 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998).

■ False pretenses have been defined as conduct intended to give a false impression that serves as an implied misrepresentation. *In re Hoover,* 232 B.R. 695, 700 (Bankr.S.D.Ohio 1999). Mere silence regarding a material fact may constitute a false representation. *In re Hoover,* at 700. Because debtors are unlikely to admit they intended to deceive, intent may be inferred from their actions at the time of and subsequent to the loss. The role of the Court is to, "... consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." *In re Patrick,* 265 B.R. 913, 916–917 (Bankr.N.D.Ohio 2001); *In re Monfort,* 276 B.R. 793, 796 (Bankr. N.D.Ohio 2001); *In re Hoover,* at 700.

■ Also, intent to deceive may be inferred where the false impressions or representations are made with a reckless disregard for their accuracy. *In re Woolley,* 145 B.R. 830, 835–836 (Bankr.E.D.Va. 1991); *In re Booth,* 174 B.R. 619, 624

(Bankr.N.D.Ala.1994); *In re Fowler,* 165 B.R. 617, 619 (Bankr.N.D.Ohio 1994). The creditor must show "justifiable reliance" on the representations.[4] To establish proximate cause, it must be demonstrated that the conduct was a substantial factor in the loss, or the loss may be reasonably expected to follow. *In re Hoover,* at 700.

■■■■■ To block the discharge of a debt under section 523(a)(6) of the Code (willful and malicious injury), it must be proved that the creditor's loss was caused by the willful and malicious conduct of the debtor. Injuries that are recklessly or negligently inflicted are not sufficient. It must be shown that there was an intent to cause harm, or that there was a substantial certainty that harm would occur. *Kawaauhau v. Geiger,* 523 U.S. 57, 61–64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *In re Markowitz,* 190 F.3d 455, 463–466 (6th Cir. 1999); *In re Bullock–Williams,* 220 B.R. 345, 347 (6th Cir. BAP 1998); *In re Devore,* 282 B.R. 643, 645–646 (Bankr. S.D.Ohio 2002).

■■■■ The Plaintiffs assert that the Defendant was fraudulent in his sale of the home by failing to disclose defects and water damage in the basement, the insect infestation, and by giving the false impression that the home had been completely renovated. Further, they assert that they have been willfully and maliciously injured by these actions. After considering all the evidence, the Court is persuaded that the willful and malicious injury provision (section 523(a)(6)) is not applicable. There is simply no evidence in the record that the Defendant ever intended to harm the Plaintiffs and their family, and as detailed above mere reckless action is not sufficient.

Turning to the false pretenses and representations provision (section 523(a)(2)(A)), two factors are identified in the case law discussing home sales. First, courts have struggled with the intent element. In cases where serious structural and mechanical defects are established, intent has been inferred because the problems are so numerous and obvious that the sellers knew or should have known. For example, in one case, after moving into their new home, the purchasers discovered faulty electrical wiring, insufficient water supply from the well, and odors from the septic system. *In re Sprague,* 205 B.R. 851, 855–857 (Bankr.N.D.Ohio 1997). In another case, after moving into a California cliffside home, the new owners discovered severe structural problems related to the stability of the ground. *In re Russell,* 203 B.R. 303, 314 (Bankr.S.D.Cal.1996). In both of these cases, the debt was found to be nondischargeable.

On the other hand, where the defects or problems are less obvious, such as water in the crawl space and termite infestations, discharges have been granted. In one

---

4. Under section 523(a)(2)(A), the standard is "justifiable reliance" as opposed to "reasonable reliance" under section 523(a)(2)(B) (False Financial Statements). One commentator has defined the distinction as follows:

> Justifiable reliance can be found in the gray area that exists between actual and reasonable reliance. This standard of reliance requires more than mere actual reliance, but does not require the type of investigation required by reasonable reliance.... *(It) is a more subjective standard ... that takes into account the interactions between and experiences of the two parties involved. This standard ... is a "fact-sensitive standard" that depends on "the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."*

Jeffrey R. Priebe, *Field v. Mans* and *In re Keim:* Excepting Debts From Bankruptcy Discharge and The Difference Between "Experienced Horsemen" and "Reasonable Men," 54 Ark. L.Rev. 99, 109–110 (2001). (emphasis supplied) (citations omitted).

case, a termite infestation was not detected by a professional exterminator prior to closing, and was not noticed until a final walk-through. *In re Wyatt,* 87 B.R. 874, 875–876 (Bankr.E.D.Va.1988). In another case, it was found that the debtor and her husband were not aware that prior repairs to a basement drainage system were no longer effective and would cause water problems for the new owners. *In re Steinberg,* 270 B.R. 831, 834 (Bankr. E.D.Mich.2001).

The second factor examined by courts in home sale cases is that of justifiable reliance. The focus is on instances where the purchasers either fail to obtain an inspection of the property prior to sale, or fail to heed obvious warnings that should prompt further inquiry. In one case, the home involved had foundation cracks, a leaking roof and a wet basement, all of which the seller concealed and failed to disclose. *In re Bryant,* 241 B.R. 756, 759–764 (Bankr. M.D.Fla.1999). The purchaser, however, failed to obtain a professional inspection, as contemplated by the purchase contract, but rather relied upon an inspection by her elderly father. *In re Bryant,* at 761. The court concluded that the purchaser failed to establish justifiable reliance. *In re Bryant,* at 767. In another case, the purchaser obtained an independent inspection. The report recommended that further inquiry should be made regarding signs of water damage; however, the purchaser disregarded the warning and acquired the property without any further questions. *In re Steinberg,* at 835. Also in this case, the court found a lack of justifiable reliance. *In re Steinberg,* at 836–837.

█ After reviewing the facts in this case, it has been concluded that there is no credible evidence of fraud regarding the alleged structural and water problems with the basement. The Defendant testified that to address problems in the basement he had it waterproofed in 1987, including the provision of a lifetime warranty. More than a year later, the basement was finished. The Defendant testified that he intentionally delayed the renovation to make sure the basement was dry, and that between 1987 and 1994, there were no water problems. The Plaintiffs attempted to offer into evidence photographs developed just prior to trial. Allegedly they were taken at some point after the closing and after the paneling was removed to expose the walls. This evidence was rejected because there is no way to know that any conditions shown in the photographs were in existence at the time of the purchase.

Almost sixteen years have passed since the basement was waterproofed, and nearly ten years have passed since the transaction was closed. While the conditions could have been present at the time of the sale, they could have also developed any time after the basement was finished with paneling. At that point any problems would not be readily apparent to the Defendant and his family. The Defendant testified that he had the basement repaired, and used it as a family room without any sign that there was still a water problem. Further, apparently no problems with the basement were found by the inspectors for the city of Detroit and the Farmers Home Administration. Given these factors, the Court cannot find any failure to disclose, misrepresentation, or false impressions regarding the basement conditions alleged by the Plaintiffs.

█ Regarding the insect infestation, the Court has reached a different conclusion. The Court finds the testimony of the Plaintiffs credible that there was an extremely severe infestation of fleas, and that it was unsafe for them to move into the home. The photographs of the Plaintiffs amply demonstrate that they were severely bitten. In particular, the Plaintiff, Mrs. Redmond, suffered from fevers

and sores, and lost her hair. On the other hand, the Defendant and his wife both testified that they were never bitten by fleas, and according to Mrs. Finch, the fleas were not even discovered until the ten-day period between closing and possession. Based upon a review of several facts, the Court does not find the testimony of the Defendant and his wife credible.

For example, the Plaintiff, Mr. Redmond, testified that the cats were confined to the basement furnace room, and appeared to be sick. Mrs. Finch testified that when she first noticed the fleas, allegedly after closing, she immediately had the cats treated and boarded. Also, Mrs. Finch testified that she purchased flea sprays and bombs from her veterinarian. The Plaintiff, Mrs. Redmond, testified that when Mrs. Finch returned to the home after possession and was confronted with the problem, she was frightened to enter the home while wearing sandals. Shortly after this visit, Mrs. Finch returned and left an unused supply of pesticides in the door. There was only a ten-day period between closing and the date when possession was transferred. The Plaintiff, Mr. Redmond, was severely bitten as soon as he entered the home to shampoo the carpeting, a mere day after the home was vacated by the Defendant and his family.

From these facts, the Court has drawn several conclusions. First, the swiftness and scope of the reaction of Mrs. Finch at the time she claims the fleas were initially noticed, indicates that the problem was in fact severe. The existence of an unused supply of pesticides strongly suggests that a large quantity was purchased by Mrs. Finch in response to the infestation. Second, when Mrs. Finch returned after the transfer of possession wearing sandals, she departed quickly when confronted by the Plaintiffs. Her reaction suggests prior knowledge and experience with the severity of the infestation. Third, there was

only a ten-day period between possession and closing, and Mr. Redmond entered the home to shampoo the carpeting a mere day after the Defendant and his family vacated the home. Fourth, the act of shampooing the carpeting would undoubtedly provide direct contact with flea infestations. Fifth, Mr. Redmond was immediately and severely bitten by fleas when he shampooed the carpeting. All of these conclusions lead the Court to the final determination that the Defendant and his wife knew they had a severe infestation of fleas, at least prior to closing.

They remained silent and allowed the transaction to close. They also allowed the Plaintiffs and their children to move into the home, putting their health at risk. The Defendant and his wife knew or should have known that remaining silent would cause the Plaintiffs severe harm. The Court has concluded that the Plaintiffs have sustained their burden, and they have established that the Defendant and his wife intentionally misrepresented the condition of the home, by their silence, in order to induce the Plaintiffs to proceed with the closing.

Regarding justifiable reliance, the Plaintiffs were not as careful as they should have been. On the other hand, it is the Court's conclusion after hearing testimony and observing the Plaintiffs, that they appear unsophisticated in real estate matters. The Defendant, however, held a real estate license. The Court concludes that in view of the Plaintiffs' relative inexperience, they were unfamiliar with the steps that should generally be taken to ascertain the true condition of a home prior to closing. Instead, they apparently relied on the inspections of the city of Detroit, the Farmers Home Administration, and a routine pest inspection. They relied on a poorly executed version of the Michigan seller's disclosure law. Finally, they also relied on the Defendant and his wife to

transfer possession of the home in a habitable condition. For these reasons, the Court concludes that the Plaintiffs have established justifiable reliance.

Finally, regarding the proximate cause element, the Court has concluded that the Plaintiffs would not have been harmed if they had been informed of the infestation at the closing. At that point, they could have refused to close, or closed but not moved until the conditions were remedied. The sellers' net proceeds could have been placed into escrow until some resolution was reached. Either of these options that depended on the candor of the Defendant and his wife, would have eliminated the harm to the Plaintiffs' physical and psychological health.

Accordingly, the judgment obtained by the Plaintiffs in the amount of $362,000.00 is nondischargeable.

**IT IS SO ORDERED.**