**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-1774**

---

In Re: RICHARD D. WHITE, d/b/a Source One
Management, LLC, d/b/a Divorce Financial
Consulting, LLC, formerly doing business as
Rick White and Company, LLC, formerly doing
business as Resource Marketing & Management;
In Re: ANTHONY D. PANGLE, formerly doing
business as Source One Management, LLC,

                                                        Debtors.

－ － － － － － － － － － － － － － － －

DAVID A. BOYUKA; ANNA BOYUKA SABLITZ,

                                Plaintiffs - Appellants,

        versus

RICHARD D. WHITE; ANTHONY D. PANGLE,

                                 Defendants - Appellees,

        and

WAYNE SIGMON; A. BURTON SHUFORD,

                                                        Trustees.

---

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte. Graham C. Mullen, Chief
District Judge. (CA-03-337-MU-3; BK-02-31152; BK-02-32203; AP-02-
3129; AP-02-3175)

---

Argued: February 2, 2005          Decided: April 28, 2005

---

Before LUTTIG, WILLIAMS, and GREGORY, Circuit Judges.

---

Reversed and remanded by unpublished per curiam opinion.

———————————

**ARGUED:** Richard Stewart Gordon, DOZIER, MILLER, POLLARD & MURPHY, Charlotte, North Carolina, for Appellants.  Richard M. Mitchell, MITCHELL, RALLINGS, SINGER, MCGIRT & TISSUE, Charlotte, North Carolina; David Russell Badger, Charlotte, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Appellants brought adversary actions against two debtors seeking to recover money paid for the purchase of certain notes and requesting that the judgment be declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2), which excludes fraudulently obtained assets from discharge. After a bench trial, the bankruptcy judge entered a judgment against the debtors and ruled that their debts were non-dischargeable. The district court reversed, finding that the debtors did not have the necessary scienter for fraud. Because we cannot conclude that the bankruptcy court clearly erred in its finding that the debtors did have the necessary scienter, we reverse the district court's order to the contrary and remand.

I.

Richard White ("White") and Anthony Pangle ("Pangle") were engaged in the business of offering financial planning advice and investment services to the public through a limited liability company operating under the name "Source One Management," of which they were the only members. During May 1999, White and Pangle made a presentation on biblical financial principles at the Pineville Church of the Nazarene ("the church"), where they were members.

3

David A. Boyuka ("Boyuka") was also a member of the church. Boyuka attended the seminar.[1]

White had been a financial planner since the early 1990s and had also sold securities. At the time of the seminar, White was a certified financial planner but had let his license for selling securities lapse. Pangle was Minister of Music at the church until he resigned to join Source One shortly before the seminar in question. He had previous experience as a salesman for a number of companies, but no certifications or licenses relating to financial planning or selling securities.

After the seminar, White and Pangle met with Boyuka. Boyuka told them that he did not need their investment services but only their estate planning services for his mother, Anna Boyuka Sablitz ("Sablitz"), also an Appellant in this case.[2] Yet, White and Pangle continued to solicit Boyuka to use Source One for investment advice. After several solicitations, Boyuka told White that he and his mother had money that they might want to place in a safe, short-term investment vehicle that would afford a better yield than

---

[1]Boyuka worked in the chemical industry in a number of positions before moving to North Carolina where he opened his own business. He holds a college degree and a MBA. He is considered an "accredited investor" with a net worth exceeding $1,000,000. He testified that most of his assets were tied up in his new business.

[2]After Boyuka moved to North Carolina, Sablitz moved to North Carolina as well. She had a heart attack shortly after moving, prompting, according to Boyuka's testimony, a need for estate planning services.

4

could be obtained through a certificate of deposit or money market account. Boyuka told White that he was not interested in a speculative investment but only a safe investment similar in risk to a money market fund.

White suggested that an entity called U.S. Capital Funding, Inc. ("U.S. Capital") which issued notes, referred to as "Corporate Funding Notes" ("Notes"), would meet his needs. White said that the Notes represented investments in a firm that provided financing for a factoring concern. He indicated that they were a safe and suitable alternative for the investments of the Boyukas' money. White showed Boyuka a brochure from U.S. Capital containing information about the Notes, and discussed with him the information contained in it. When Boyuka questioned White about whether U.S. Capital would pay interest and principal on the Notes, White responded, "everything I've seen says they have." J.A. 228.

Thereafter, Boyuka purchased one of the Notes for $50,000 and Sablitz purchased another for $75,000. Pangle filled out and submitted the paperwork on their behalf to U.S. Capital. White and Pangle received commissions on the sales of the Notes.

Within the year following issuance of the Notes to the Boyukas, U.S. Capital was placed into receivership and it was revealed that the operation was a large Ponzi scheme.[3] This scheme

---

[3]A Ponzi scheme is essentially "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors," rather than made from the

defrauded a great number of investors, across several states. Although Boyuka and Sablitz received one installment of interest on the Notes they purchased, the principal and all subsequent installments of interest are and continue to be in default. White did make some effort after the Ponzi scheme was discovered to recover the Boyukas' money by calling and sending e-mails to U.S. Capital asking that the money be returned.

The main point of dispute at the bench trial was whether White and Pangle had the scienter necessary to deny their discharge in bankruptcy. White and Pangle claimed that they believed the Notes were good investments.[4] In contrast, Boyuka and Sablitz claimed that neither White nor Pangle ever made any significant investigation of the Notes.

After a two-day bench trial, the bankruptcy judge found that White and Pangle were liable to the Boyukas for the value given to them for the Notes (less the money the Boyukas received as interest) and that the liabilities were non-dischargeable. Specifically, the bankruptcy judge concluded, in pertinent part, that:

---

success of a legitimate business venture. United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001) (citation omitted).

[4]Pangle presented a slightly different defense. He argued that he was only a salesman for Source One and knew little about the Notes, instead relying on the knowledge and expertise of White.

6

- in general the testimony of Boyuka was more credible than White and Pangle and thus if there was a conflict between the testimony, Boyuka's account was more accurate;

- White and Pangle were guilty of fraud by willfully and recklessly failing to divulge two material facts -- that the Notes were unregistered and that they were not licensed to sell the investments; they were also guilty of a direct material misrepresentation when they represented the Notes as safe investments;

- the willful and reckless failure of White and Pangle to undertake any kind of reasonable, diligent investigation of the Notes prior to selling them, coupled with their blind endorsement of the promotional claims of U.S. Capital, sufficed to form the scienter required to deny discharge; and

- the Boyukas justifiably relied on White and Pangle's misrepresentations because under the circumstances nothing was apparent from a cursory glance to indicate that they should beware.

J.A. 594-603.

The district court reversed the bankruptcy court concluding that "[w]hile White and Pangle can readily be characterized as 'dumb but honest' the totality of the circumstances does not reveal recklessness sufficient to impute scienter." Id. at 618. The district court acknowledged "that this case is as close as a case

7

can be to the line separating mere negligence from recklessness sufficient to equate with scienter." Id. at 617. However, it found that given the strict standard by which dischargeability exceptions are construed, it disagreed with the bankruptcy court's conclusions. It considered it important that "[t]here was at least some attempt, however meager, to investigate the information in U.S. Capital's promotional materials" and that White made efforts after the fact to get the Boyukas money back. Id. at 618. This appeal follows.

## II.

Section 523(a)(2)(A) of the Bankruptcy Code provides an exception to discharge from debts obtained by fraud. It states, in pertinent part, as follows:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt-
> (2) for money, property, services, . . . to the extent obtained by-
> (A) false pretenses, a false representation, or actual fraud . . .

11 U.S.C. § 523(a)(2)(A) (2004). Exceptions to discharge are narrowly construed to further the Bankruptcy Code's "fresh start" policy; thus, the claimant has the burden to demonstrate that his claim comes within an exception to discharge by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991). Still, the very purpose of some sections of the Bankruptcy Code "is to make certain that those who seek shelter of the bankruptcy code do

not play fast and loose with their assets or with the reality of their affairs." Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997).  In this respect, § 523(a)(2)(A), is intended to make certain that those who obtain property by fraudulent means are not afforded bankruptcy protection.  Id.

To establish that a debt should not be subject to discharge, a claimant must prove:

> (1) that the debtor made a fraudulent misrepresentation;
> (2) that the debtor's conduct was with the intention and purpose of deceiving or defrauding the creditor;
> (3) that the creditor relied on the debtor's representations or other fraud; and
> (4) that the creditor sustained loss and damage as a proximate result of the representations of fraud.

In re Biondo, 180 F.3d 126, 134 (4th Cir. 1999); In re Hale, 274 B.R. 220, 222-23 (Bankr. E.D. Va. 2001)[5].  Element one is satisfied if the debtor's representation was known to be false or recklessly made without knowing whether it was true or false.  In re Woolley, 145 B.R. 830, 834 (Bankr. E.D. Va. 1991) (citing In re Taylor, 514 F.2d 1370, 1373 (9th Cir. 1975)).  Pertinent considerations for determining recklessness are the debtor's pattern of conduct and his prior business expertise.  Id. at 834-35.

---

[5]In Field v. Mans, 516 U.S. 59 (1995), the Supreme Court established that § 523(a)(2)(A) incorporated the "general common law of torts." Id. at n.9. These elements are thus taken from the definition of fraudulent misrepresentation under the Restatement (Second) of Torts (1976). See In re Biondo, 180 F.3d at 134.

The conclusion that a debtor knew that his representations were false is closely linked to, but separate from, the issue of an intent to deceive to influence another's conduct.[6] Indeed, most cases, including this one, revolve around this second element: whether the debtor acted with the requisite intent to defraud. In the situation presented here, when a debtor invests funds on behalf of another party, "a debtor will be found to have acted with the requisite intent to defraud under § 523(a)(2)(A) when, at the time the transaction occurred, it is established that the debtor, for his or her personal gain, knowingly mislead the investor as to a material fact concerning the investment." In re Grim, 293 B.R. 156, 163 (Bankr. N.D. Ohio 2003). A showing of reckless indifference to the truth is sufficient to demonstrate the requisite intent to deceive. Umpierrez, 121 F.3d at 787; In re Bonnanzio, 91 F.3d 296, 301 (2d Cir. 1996); In re Woolley, 145 B.R. at 835. Because a debtor will rarely, if ever, admit to acting with an intent to deceive, intent may be inferred from the totality of the circumstances. Umpierrez, 121 F.3d at 789; In re Woolley, 145 B.R. at 836.

Element three will be satisfied by a showing of "justifiable reliance" on the representations. This standard of reliance

---

[6]In this case, the facts that go to elements one and two are virtually identical. Yet, we recognize that in some cases, facts that may establish element one will not establish element two. See Palmacci, 121 F.3d at 788 (finding fraudulent misrepresentations, but not scienter, established).

requires more than actual reliance but less than reasonable reliance. In re Justice, No. 01-02156, 2002 Bankr. LEXIS 1540, n.3 (Bankr. N.D. Ohio Dec. 27, 2002). "It is a more subjective standard . . . that takes into account the interactions between and experiences of the two parties involved." Id. (quoting Jeffrey R. Priebe, *Fields v. Mans* and *In re Keim*: Excepting Debts From Bankruptcy Discharge and The Difference Between Experienced Horsemen and Reasonable Men, 54 Ark. L. Rev. 99, 109-110 (2001)).[7]


III.

A court reviewing a decision of the bankruptcy court may not set aside findings of fact unless they are clearly erroneous, giving "due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bank. P. 8013. We review the bankruptcy court's legal conclusions de novo. In re Wilson, 149 F.3d 249, 251 (4th Cir. 1998). Although the district court has already reviewed the bankruptcy court's decision, on appeal we independently review that decision, applying the same standard of review that the district court applies. Id. at 251-52. No special deference is owed to the district court's determinations. Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994).

---

[7]Element four is not at issue in this appeal.

A finding of fact is clearly erroneous, although there is evidence to support it, when the reviewing court, after carefully examining all of the evidence, is "left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). Deference to the bankruptcy court's factual findings is particularly appropriate on the intent issue "[b]ecause a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor." In re Burgess, 955 F.2d 134, 137 (1st Cir. 1992), abrogated on other grounds by Field v. Mans, 516 U.S. 59 (1995). Of course, a trial court may not

> insulate [its] findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

Anderson, 407 U.S. at 575.

A.   Knowing Misrepresentation

The bankruptcy court found that White and Pangle recklessly made three essential misrepresentations:  they failed to disclose that the Notes were unregistered; they failed to disclose that they were not licensed to sell securities; and they directly

12

misrepresented the Notes as safe investments.[8]  Regarding the first two misrepresentations, the bankruptcy court concluded that the Notes qualified as securities under both the Securities Act of 1933 and the Securities Exchange Act of 1934.[9]  In addition, it found that White knew, based on his prior training and experience, that under certain circumstances securities are required to be registered and that those selling securities must be licensed.

In its conclusion on the third misrepresentation, the bankruptcy court noted that the only information that White and Pangle obtained, independent of U.S. Capital's promotional materials, was a Dun & Bradstreet report and anecdotal information from other customers who had bought the Notes regarding whether they were receiving their interest payments.  White, nonetheless, stated to Boyuka that he believed the Notes were safe and secure; that he had done business with U.S. Capital many times before; and that he knew the principals of U.S. Capital personally.

In their defense, White and Pangle argue that they did not knowingly misrepresent the Notes because they did not know that the Notes were supposed to be registered as securities.  White testified that he researched North Carolina law, which he read to

---

[8]The district court reversed the bankruptcy court on its finding of scienter only, but we must address the other issues of knowing misrepresentation and justifiable reliance, which White and Pangle raised before the bankruptcy court and on appeal, as well.

[9]White and Pangle do not challenge this legal conclusion.

13

exempt such short-term notes from registration,[10] and that U.S. Capital told him that the Notes were not required to be registered. We review the bankruptcy court's factual findings on this issue for clear error.

We cannot say that the bankruptcy court committed clear error in finding that White and Pangle made knowing misrepresentations. Their failure to disclose that the securities were required to be registered and that they were not licensed to sell securities was indeed reckless given White's prior experience and training with securities. They also recklessly misrepresented the Notes as safe when in actuality they had done little research to substantiate this statement. As noted by one bankruptcy court in a similar case involving short-term notes:

> Before selling the notes, the broker must review available investment ratings from qualified financial rating services. The broker must request and review with a critical eye audited financial statements . . . as well as other literature . . . discussing . . . sales history and the background of key employees. A broker cannot rely on slick, marketing brochures or insurance coverage, refrain from asking hard questions about the legitimacy of the product, and then assure a proper investigation was conducted.

In re World Vision Entertainment, Inc., 275 B.R. 641, 645 (Bankr. M.D. Fla. 2002). While we need not adopt such a checklist here,[11]

---

[10]White testified that he did not consult federal law.

[11]The In re World Vision court used this checklist in determining whether the brokers in the case before it were entitled to a "good faith" defense, available to recipients of avoidable transfers from a debtor operating a Ponzi scheme. 275 B.R. at 658.

14

it is instructive that White and Pangle failed to make even one of these type of inquiries. As the bankruptcy court found, a reasonably diligent investigation of the claims made by U.S. Capital's promotional material would have revealed that many of them were false. J.A. 599. Thus, we find that no clear error occurred.

B. Intent to Deceive

The bankruptcy court found that White and Pangle's reckless misrepresentations combined with their endorsement of the promotional claims of U.S. Capital sufficed to form the scienter necessary to deny discharge. This is a factual finding that we review for clear error. See Umpierrez, 121 F.3d at 790; In re Bonnanzio, 91 F.3d at 301. As noted, deference to a factual finding on the intent issue is particularly appropriate because it depends largely upon an assessment of the credibility and demeanor of the debtor.

We agree with the district court's assessment that this is as close as a case can be to the line separating mere negligence from recklessness sufficient to equate with scienter. However, it is for this reason that the district court erred in reversing the bankruptcy court on the issue of intent. As the clear error standard mandates, to reverse we must be left with the definite and firm conviction that a mistake has been made. The district court, it seems, conducted something like a de novo review of the record making its own credibility assessments and re-weighing the evidence.

15

The bankruptcy court heavily relied on the case of In re Justice, No. 01-2156, 2002 Bankr. LEXIS 1540 (Bankr. S.D. Ohio), a case that closely parallels the one before this court.[12] In In re Justice, the bankruptcy court found that the actions of the debtor, who was the creditor's financial advisor, in inducing the creditor to invest in what turned out to be a fraudulent securities investment constituted gross recklessness rising to the level of an intent to deceive. 2002 Bankr. LEXIS 1540, at *20. The facts that distinguish Justice from the instant case are that the debtor had a prior business relationship with the creditor, who invested his life savings in the investment, and that the debtor and creditor had significant differences in their education and sophistication. Id. at *16-22.

These differences serve to make Justice a more egregious case of recklessness, but do not make this case one of mere negligence. As in Justice, the overwhelming failure of White and Pangle to do any real investigation into the Notes characterizes their recklessness. Their actions evidence that they wanted to receive commissions without asking the hard questions.

---

[12]In Justice, the debtor represented the investment as "safe" to the creditor; the debtor, who had experience with securities, relied solely on the claims of the investment brochure that it was exempt from registration and otherwise legitimate; the debtor did not call the SEC, the Ohio Attorney General, any financial rating service, or otherwise test the validity of the information; and the debtor did not question how the investment could guarantee such a high rate of return. 2002 Bankr. LEXIS 1540, at *16-22.

16

Similarly, In re World Vision, a case not relied on by the bankruptcy court in its scienter finding, is instructive. This case concerned whether a bankruptcy trustee could pierce the corporate veil of corporate defendants, who had allegedly received fraudulent transfers of broker's fees paid in connection with a Ponzi scheme operated by the debtor. 275 B.R. at 645. While In re World Vision is procedurally different, the type of investigation done by brokers selling the debtor's notes is strikingly similar to the instant case. The brokers' investigation in In re World Vision consisted of concluding that the Notes were not subject to registration after consulting state securities law and running a Dun & Bradstreet report. 275 B.R. at 650. As the In re World Vision court aptly concluded:

> [The broker] therefore started selling the debtor's notes based upon verbal assurances from the debtor, a look at the debtor's slick marketing brochures, a cursory check on [the debtor on Dun & Bradstreet], and possibly, a little legal research. [The broker] never made any good faith attempt to ascertain the legitimacy of the debtor, the debtor's business, or the note program.
>
> . . .
>
> By and large, [the broker] merely accepted the debtor's representations that the debtor's notes were a legal, viable, investment. [The broker]'s cursory and almost nonexistent investigation indicates that he did not want to know more. He saw the notes promising a high interest earned by investors in a quick period of time and promising high commissions for his agents and himself. He was sold. [The broker] simply did not ask how the debtor was going to earn the 30 percent return needed to pay the notes or whether the underlying certificate of insurance was valid. [The broker] did not want to know that the debtor's promises were too good to be true.

17

<u>Id.</u> at 650-51.

Because an intent to deceive may be found upon a finding of recklessness and the facts of the instant case are similar to other cases in which courts have found the requisite level of recklessness, the bankruptcy court did not clearly err in likewise holding.[13]  As discussed, this is a close case, but we are not left with a firm and definite conviction that the bankruptcy court made a mistake.

C.    <u>Justifiable Reliance</u>

The bankruptcy court found that under the circumstances nothing was apparent to indicate to the Boyukas that they should be wary of this investment, especially given that the solicitations arose out of a church relationship.  White and Pangle argue that this finding was error and contend that Boyuka was an experienced businessman, who should have done research into the investments himself.  This is likewise a factual finding that we review for clear error.  <u>See</u> <u>In re Bonnanzio</u>, 91 F.3d at 304.

The bankruptcy court did not clearly err in this regard. Justifiable reliance is a subjective standard that takes into

_____

[13]While the recklessness of Pangle may be an even closer question, the bankruptcy court did not clearly err in finding that his involvement in Source One, especially his role as a salesman of the Notes, without knowing anything about financial investments, was also extremely reckless.  Indeed, Pangle should have known of the risks involved with investments because he had personally lost money on a "payphone" investment that White had recommended to him. J.A. 79.

18

account the relationship of the parties.  Here, the parties met at church and White and Pangle solicited Boyuka during a seminar held at the church.  It is not clearly erroneous to find that such a setting would engender more of a feeling of trust than would occur in some other settings.  The Boyukas also took time to review U.S. Capital's materials after being solicited by White and Pangle repeatedly.  Thus, they did not rush into their decision to invest in the Notes.  The fact that Boyuka is an accredited investor does not negate a finding of justifiable reliance because the bankruptcy court found that Boyuka's education and experience involved business management and that he did not have extensive knowledge of securities.

IV.

In conclusion, we find that the bankruptcy court did not commit clear error and reverse the district court's order to the contrary. On remand the district court will return the case to the bankruptcy court for the entry of an order consistent with this opinion.

REVERSED AND REMANDED

19